**ENVIRONMENTAL WASTE REDUCTIONS, INC.,
Plaintiff,**

**v.**

**Harold REHEIS, Director, Environmental Protection Division, Georgia Department of Natural Resources, Defendants.**

Civ. A. No. 1:94–cv–1498–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 28, 1994.

Order Granting New Trial on
Attorney Fees Jan. 12, 1995.

Consent Order on Attorney Fees
Feb. 1, 1995.

Brenda Sue Hill Cole, State of Georgia Law Dept., Atlanta, GA, for defendants.

## ORDER

HULL, District Judge.

This matter is before the Court for final decision after a bench trial on August 30, 1994. By agreement of the parties, the Court consolidated the hearing on the plaintiff's application for a preliminary injunction with the trial of the action on the merits of plaintiff's requests for a declaratory judgment and a permanent injunction. Fed. R.Civ.P. 65. After considering all of the evidence, reviewing the record and exhibits in their entirety, and hearing oral argument of counsel, this Court finds as follows.

## I. *FINDINGS OF FACT*

All parties entered into an extensive stipulation covering and agreeing to the vast majority of the facts in this case. Where a stipulation is cited for the Court's finding of fact, the Court adopts and quotes from the parties' stipulation. If the Court's finding of fact is not based on the stipulation, but is based on other evidence in the record, then the Court will reference that evidence as well.

This action involves plaintiff's attempts for over two years to build and operate an advanced technology biomedical waste treatment facility in Quitman County, Georgia. Under Georgia law, biomedical waste is regulated as a form of non-hazardous solid waste. No environmental issues are presented herein. All parties stipulated that plaintiff's proposed facility more than satisfies all applicable federal and state environmental laws and regulations. Plaintiff's proposed facility will enhance environmental protection by disposing of biomedical waste currently sent to landfills or burned at aging on-site hospital incinerators, which are below environmental standards.

The issues herein concern whether certain provisions in Georgia's Comprehensive Solid Waste Management Act, O.C.G.A. § 12–8–24, which impose on plaintiff's facility "Georgia need" restrictions, planning requirements and transportation limitations based on the

Patricia T. Barmeyer, King & Spalding, Atlanta, GA, for plaintiff.

geographic origin of the waste, violate the Commerce Clause of the United States Constitution. Plaintiff seeks a declaratory judgment that certain provisions in Georgia's Comprehensive Solid Waste Management Act are unconstitutional under the Commerce Clause; the State seeks to uphold its legislation.

## A. *THE PARTIES*

1.

Plaintiff Environmental Waste Reductions, Inc. ("EWR") is a Georgia corporation with its principal place of business at 5940 Peachtree Road, Atlanta, Georgia 30341. Since December, 1991, EWR has been in the process of obtaining a solid waste permit (the "Permit") and other necessary permits and authorizations to construct and operate a biomedical waste incinerator in Quitman County, Georgia. Stipulations ("Stips"), ¶ 1.

2.

At the present time, plaintiff EWR is engaged in the business of transporting biomedical waste from generators of that waste, primarily hospitals and doctors' offices, to existing incinerators. EWR operates the biomedical waste collection and transportation business pursuant to a permit by rule. EWR presently operates, also by authority of a permit by rule, a transfer station in DeKalb County, Georgia, to transfer biomedical waste for further transportation and disposal. Stips, ¶ 2.

3.

Harold F. Reheis is the Director of the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") and, as such, is the permitting authority for EPD. Stips, ¶ 3.

## B. *THE PROPOSED FACILITY*

4.

Plaintiff EWR proposes to construct and operate an advanced technology biomedical waste incinerator facility in Quitman County, Georgia ("the facility"). As set forth in the original application filed with defendant EPD on December 16, 1991, plaintiff's proposed incinerator was to operate at a capacity of 42 tons of biomedical waste per day. If operated in compliance with the Permit, air emissions from the facility will be below federal and state emissions limitations, there will be no process wastewater discharge from the facility, and the incinerator ash will be disposed of in a lined landfill in accordance with state and federal law. Stips, ¶ 6.

5.

The facility will be located in rural Quitman County, a county with a total population of less than 2,500 people. The facility will be located on Lower Lumpkin Road, approximately seven miles from the City of Georgetown, the county seat of Quitman County, a city of about 700 residents. The site is five acres of land, which is surrounded on all sides by timberland owned by Mead Paper Company, Burgin Lumber Company, and the individual from whom the site was purchased. The nearest residence is approximately 2½ miles from the site. A church is located almost half a mile from the proposed facility. The site is approximately 10 miles from the boundary between Georgia and Alabama. Stips, ¶ 7.

6.

The proposed EWR facility will offer a convenient, cost-effective disposal alternative to both large quantity and small quantity generators of biomedical waste. Incineration at a state-of-the-art incinerator is far more protective of the environment than disposal of biomedical waste in unlined county landfills or incineration at aging on-site hospital incinerators. Stips, ¶ 14.

## C. *REGULATION OF BIOMEDICAL WASTE*

7.

Biomedical waste is a defined term, O.C.G.A. § 12–8–22(1.1) (1992), which is a subcategory of solid waste, O.C.G.A. § 12–8–22(33) (1992).

8.

Biomedical waste consists, *inter alia,* of pathological waste, biological waste cultures and infectious stocks, and other waste from contaminated animals, sharps, chemotherapy

waste, discarded medical equipment and parts, not including expendable supplies and materials which have not been decontaminated. Ga.Comp.R. & Regs. r. 391–3–4–.15. Incineration of biomedical waste is a more preferable means of disposal than a landfill because incineration destroys all pathogens, blood and tissue, leaving only inorganic ash. Doctors and hospitals have favored incineration over landfills because it reduces the public health concern. 1994 Reheis Deposition, P–Ex 30 at 25–27; *see* Stips ¶ 14.

9.

Until 1989, the Georgia law and regulations regarding solid waste made no distinction between biomedical waste and other solid waste. In 1990, as part of the Georgia Comprehensive Solid Waste Management Act, the General Assembly first defined the term and authorized the Board of Natural Resources to adopt regulations governing and controlling the handling of biomedical waste. O.C.G.A. § 12–8–23(1)(E) (1992); Ga. Laws 1990, p. 412, § 1. As recently as September, 1991, biomedical waste even from large quantity generators (100 pounds or more per month) could legally be disposed of at landfills in Georgia. Even under the current rules, biomedical waste from small quantity generators (less than 100 pounds per month) can legally be disposed of at landfills, if the landfill will accept the waste. Ga.Comp.R. & Regs. r. 391–3–4–.15(7)(b) (1993); Stips, ¶ 8.

10.

Most landfills in Georgia will not accept biomedical waste. Biomedical Waste Treatment/Disposal Capacity Need in Georgia, P–Ex 13 at 6. Many small quantity generators of biomedical waste (such as hospitals) choose to dispose of their biomedical waste at a biomedical waste treatment or disposal facility (usually next to the hospital or at an incineration facility) instead of at a landfill. Testimony of Armistead, P–Ex 35 at 7–8. Small quantity generators are authorized to dispose of their biomedical waste at municipal solid waste landfills. However, most landfills in Georgia, including privately-owned landfills, refuse to accept biomedical waste for disposal. (Director's Exhibits 10, 21). A small number of rural landfills in Georgia continue to accept biomedical waste generated by local doctors and clinics. Stips, ¶ 11; Director's Exhibit 7.

11.

Reuse and recycling are not particularly relevant to biomedical waste. EPD is "not taking any steps to promote recycling and reuse in the health care industry." 1994 Reheis Deposition, P–Ex 30 at 25–27. No one appears to contend that biomedical waste can be either reused or recycled.

12.

In his deposition, the Director admitted that in his capacity as head of EPD, he has acknowledged that "incineration, if properly designed, properly monitored, properly controlled, properly regulated, doesn't pose significant environmental risks." 1994 Reheis Deposition, P–Ex 13 at 16. Incineration of biomedical waste at plaintiff's permitted facility will not present environmental risks.

13.

Since proper permitted incineration of biomedical waste does not pose an environmental threat, the principal concern in the disposal of biomedical waste is to eliminate or reduce the exposure to the handlers and thus the public during the collection and transportation of biomedical waste. Special handling and treatment of biomedical waste can minimize and eliminate the threat of exposure during collection and transportation of biomedical waste. Reheis Deposition, p. 13.

**D. ON–SITE INCINERATORS NEXT TO HOSPITALS IN MANY CITIES ARE OLD AND NOT AS TECHNICALLY SOPHISTICATED AS PLAINTIFF'S PERMITTED FACILITY**

14.

With the onset of "universal precaution" practices among health care providers, more biomedical waste has been generated, and generators of biomedical waste, especially at hospitals, are increasingly concerned about potential liabilities associated with such waste. Stips, ¶ 12.

15.

Hospitals in Georgia are authorized by a permit by rule to construct and operate on-site incinerators to burn their own biomedical waste (and up to 25 percent more waste from off-site) without the necessity of obtaining an individual solid waste permit. Ga.Comp.R. & Regs. r. 391–3–4–.15(6)(e) (1993). Many hospitals in Georgia continue to operate on-site incinerators next to the hospitals in most cities. Most of these on-site incinerators are old and are not technically sophisticated; none has emissions controls as stringent as those provided for in the plaintiff's EWR permit for the facility in Quitman County, Georgia. Stips, ¶ 9; Armistead Deposition, P–Ex 34 at 19.

16.

Georgia Baptist Hospital in Atlanta operates an on-site incinerator to burn its own biomedical waste. In addition, Georgia Baptist Hospital, for a fee, takes in out-of-state and Georgia biomedical waste and burns it at its on-site incinerator in Atlanta. Georgia Baptist Hospital in Atlanta is disposing of up to 2.5 tons per day of biomedical waste from other generators in its on-site incinerator. Stips, ¶ 10. The Georgia Baptist Hospital facility does not have emissions controls as stringent as those provided in plaintiff's EWR permit for the facility in Quitman County, Georgia. *See* Stips, ¶ 9, 10, Armistead Deposition, P–Ex 34 at 19.

## E. *BIOMEDICAL WASTE INDUSTRY IN GEORGIA AND SURROUNDING STATES*

17.

At the present time, there is evidence of only one commercial biomedical waste incinerator in Georgia which is permitted and authorized to accept biomedical waste from generators throughout Georgia and from other states, i.e., the facility of Bio–Medical Service Corporation, Inc., a division of Browning–Ferris, Inc. ("BFI"), which is located in Lake City, Clayton County, just south of Atlanta.

Another commercial biomedical incinerator permit has been issued to the Medical Center of Central Georgia ("MCCG"); however, a Bibb County ordinance prohibits MCCG from accepting waste from outside Bibb County unless it obtains a permit from Bibb County.

18.

Presently, large quantities of biomedical waste *generated outside of Georgia* are transported to Georgia for thermal treatment and disposal. For instance, the BFI incinerator in Lake City, Georgia treats and disposes of approximately 3 million pounds of biomedical waste generated outside Georgia in a year. This waste is generated principally in Alabama. Reheis Deposition, at pp. 30–31; Armistead Deposition, at 29–30.

19.

Plaintiff EWR has approached several hospitals in Georgia about contracting to utilize any excess capacity up to 25 percent of their total biomedical waste burned but has been refused by all hospitals except Georgia Baptist Hospital in Atlanta. Armistead Deposition, P–Ex 34 at 32. In addition, plaintiff EWR incinerates biomedical waste generated in Alabama at the Georgia Baptist Medical Center incinerator. Armistead Deposition, at 34.

20.

Large quantities of biomedical waste generated in Georgia are also transported to other states for disposal. EWR, BFI, Scientific Waste Systems ("SWS"), MedX, and Biomedical Disposal Services and Waste Management all transport Georgia-generated biomedical waste to disposal facilities in other states. Armistead Deposition, P–Ex 34 at 21–24.

21.

The following out-of-state disposal facilities are being used to dispose of large quantities of biomedical waste generated in Georgia: Ogden Martin's facility in Leesburg, Florida; Recovery Corporation of America's facility in Cocoa Beach, Florida; Chambers Medical Technology's facility in Hampton, South Carolina; Recovery Corporation of America's facility in Matthews, North Carolina; National Medical Waste's facility in Nashville, Tennessee; Eco–Med's facility in Birmingham, Alabama; and an autoclave in Bowling Green,

Kentucky. Armistead Deposition, P–Ex 34 at 34.

22.

BFI's prices range from 18 cents per pound of biomedical waste to three dollars per pound of biomedical waste. Armistead Deposition, P–Ex 34 at 32.

23.

Plaintiff EWR has been quoted and is currently paying disposal prices at out-of-state incinerators which are significantly lower than the prices charged by BFI. Prices at several large out-of-state disposal facilities range from 8.5 cents per pound to 10 cents per pound. Armistead Deposition, P–Ex 34 at 28, 34–38.

24.

BFI serves approximately 45 percent of the Georgia biomedical waste market. Occasionally, when BFI's Lake City disposal facility is inoperable, BFI hauls biomedical waste to out-of-state disposal facilities. Armistead Deposition, P–Ex 34 at 21. SWS hauls its waste to National Medical Waste in Nashville. SWS has approximately 13 percent of the Georgia biomedical waste market and in 1993, transported approximately 3,800,000 lbs. of biomedical waste out-of-state. Id. at 22. In addition, SWS also collects waste in Alabama, Tennessee, and South Carolina and some of that waste is imported into Georgia, consolidated with Georgia waste, and transported to an out-of-state disposal facility. Id. MedX hauls approximately 3,600,000 lbs. of Georgia biomedical waste, which is incinerated at either the Chambers facility in South Carolina or the Recovery Corporation facility in North Carolina or is processed at MedX's autoclave in Lakeland, Florida. Id. at 23. EWR is next in size after MedX based on Georgia market share. EWR has exclusive rights to incinerate biomedical waste at the incinerator at Georgia Baptist Medical Center. EWR hauls amounts of waste which it collects which exceed Georgia Baptist's capacity to Ogden Martin's facility in Leesburg, Florida. Bio–Medical Services, which is next in size following EWR, incinerates approximately 1,000,000 lbs. yearly at the Chambers facility in South Carolina. Id. at 23–24. Waste Management and several smaller haulers scattered over the State also haul waste. Most of the waste collected by these smaller companies is incinerated out-of-state. Id. at 24.

25.

Plaintiff EWR has been using incineration services at Georgia Baptist Hospital since early May, 1994. Armistead Deposition, P–Ex 34 at 32. EWR has attempted to enter into similar arrangements with other hospitals for use of their on-site incinerators without success. Id. at 33–34. EWR has exhausted the capacity of Georgia Baptist and is now transporting waste which exceeds the capacity to the Ogden Martin facility in Leesburg, Florida. EWR has two sales people working in the field in addition to Ralph Armistead, Vice President of Sales and Marketing. Id. at 7, 39. EWR has a permanent transfer station located at 5940 Peachtree Road in DeKalb County. EWR has trucks which haul biomedical waste from its customers to its transfer station for consolidation. In addition, EWR has "wholesale" customers who pick up from their own customers and bring the waste to EWR's transfer station. Id. at 40.

26.

Plaintiff EWR recently signed a contract with a customer in Alabama. The State of Alabama requires that biomedical waste be refrigerated if it is stored more than seven days, and it is more cost-effective for EWR to haul the waste more frequently than to refrigerate it. As a result, EWR will keep a trailer at its Alabama customer's facility for the storage of biomedical waste and will haul the trailer from this customer once weekly, even though the trailer will not be full at the end of a week. EWR will then haul the trailer to its DeKalb County transfer station and consolidate the Alabama biomedical waste with the Georgia biomedical waste collected from local biomedical waste generators. EWR will then haul this waste to Leesburg, Florida for processing. Armistead Deposition, P–Ex 34 at 39–40.

27.

Once plaintiff EWR's proposed facility is operational, EWR will offer its customers a one-half cent price decrease because it antici-

pates lower operating costs due to the shorter haul to Quitman County rather than Florida. Armistead Deposition, P–Ex 34 at 44–46.

28.

Plaintiff EWR does not use the BFI facility because EWR can haul waste to the Ogden Martin incinerator in Florida for a cost less than the price charged by BFI and because EWR does not want to disclose its customer list to BFI for fear that BFI will solicit its customers. Armistead Deposition, P–Ex 34 at 51–52; Watson Affidavit, P–Ex 52 at 11.

### F. BIOMEDICAL WASTE IN INTERSTATE COMMERCE

29.

Biomedical waste and services for the transportation and disposal of biomedical waste are articles of commerce which are in the stream of interstate commerce. Stips, ¶ 13.

30.

Other than its geographical origin, there is no difference between biomedical waste generated in Georgia and biomedical waste generated in other states. Stips, ¶ 16.

31.

Approximately 22 tons per day or 15,800,-000 pounds per year of the biomedical waste generated in the State of Georgia is transported to out-of-state disposal facilities. Armistead Deposition, P–Ex 34 at 53. Some out-of-state biomedical waste is transported into Georgia for disposal at BFI's facility or for transfer and transportation to out-of-state facilities. Id. at 21–22.

32.

The market for biomedical waste services is regional. Armistead Deposition, P–Ex 34 at 21–23. The companies in Georgia which collect and transport biomedical waste compete for business from generators in Georgia and neighboring states. Id. The one commercial disposal facility in Georgia, already permitted by defendant EPD, accepts waste from customers not only in Georgia but also from other states. Id. at 21. When selecting a company to collect and transport their biomedical waste to a disposal facility, generators of biomedical waste are choosing, on the basis of cost and the disposal site, between competing companies which dispose of waste at BFI in Georgia or at disposal facilities in neighboring states. Id. at 14. As a result, in choosing a disposal facility, companies in the business of collecting and transporting biomedical waste in Georgia choose, on the basis of cost and other factors, between competing disposal facilities in Georgia and neighboring states.

33.

Once its facility in Georgia is constructed, plaintiff EWR will compete with existing commercial incinerators for waste from throughout Georgia, as well as from Alabama and northern Florida. Stips, ¶ 14.

### G. THE "GEORGIA NEED" REQUIREMENT IN THE COMPREHENSIVE SOLID WASTE MANAGEMENT ACT

34.

In 1990, as an amendment to the Comprehensive Solid Waste Management Act (the "Act"), Georgia established an additional permitting requirement applicable only to a biomedical waste incinerator. The Act provides as follows:

No permit for a biomedical waste thermal treatment technology facility shall be issued by the director [of EPD] unless the applicant for such facility demonstrates to the director that a need exists for the facility for waste generated in Georgia by showing that there is not presently in existence within the state sufficient disposal facilities for biomedical waste being generated or expected to be generated within the state.

O.C.G.A. § 12–8–24(b)(1) (Supp.1994) (the "Georgia need" requirement), originally codified at O.C.G.A. § 12–8–23.1(c)(1), Ga.Laws 1990, p. 1222, § 1. The Act does not require any showing of "need" for a permit for any other type of solid waste facility. Stips, ¶ 15. However, the Act requires a showing of a need for a facility to dispose of biomedical waste generated in Georgia before a permit will issue.

## H. *THE PLANNING REQUIREMENTS*

### 35.

As part of the permitting process, the Act requires that an applicant for any solid waste disposal permit demonstrate, not only that the proposed facility complies with all local zoning and land use ordinances and that the facility is consistent with the host jurisdiction's approved solid waste management plan, but also that "all jurisdictions generating solid waste destined for the applicants' facility can demonstrate that they are part of an approved solid waste plan ... and are actively involved in and have a strategy for meeting the state-wide goal of waste reduction by July 1, 1996." O.C.G.A. § 12–8–24(g) (Supp.1994); *see also* O.C.G.A. § 12–8–31.1(e)(3) (Supp.1994). The EPD regulations require that this showing be in the form of verification letters from the cities and counties from which the waste is generated. Ga. Comp.R. & Regs. r. 391–3–4–.02(10) (1993). Collectively, those statutory and regulatory provisions are referred to as the "Georgia planning requirements." Stips, ¶ 17.

### 36.

EPD has not construed the Georgia planning requirements to be limited to the waste actually generated by jurisdictions but to include all municipal solid waste generated by any generators, public or private, within any jurisdiction, and thus to apply to all municipal solid waste in Georgia. Stips, ¶ 18.

### 37.

The Act also provides that:

Prior to the issuance of any permit for a solid waste handling facility ... that will handle solid waste from jurisdictions outside Georgia, the out-of-state solid waste generating jurisdictions shall provide documentation that they have a strategy for and are actively involved in meeting planning requirements and a waste reduction goal that are substantially equivalent to the planning requirements and waste reduction goal contained in this part.

O.C.G.A. § 12–8–24(g) (Supp.1994) (the "out-of-state planning requirements"). Stips, ¶ 19.

### 38.

Thus, the Act requires that plaintiff EWR, to obtain a permit for its facility, must show (1) that in-state jurisdictions, generating waste "destined" for plaintiff's facility, have an approved solid waste plan and have an active strategy for meeting Georgia's goal of waste reduction, and (2) that out-of-state jurisdictions, generating waste "destined" for plaintiff's facility, have a strategy and actively are involved in meeting planning requirements and a waste reduction goal substantially equivalent to Georgia's.

## I. *THE LIMITATION ON TRANSPORTATION*

### 39.

The Act provides:

Any permit for the transportation of municipal solid waste from a jurisdiction generating solid waste to a municipal solid waste disposal facility located in another county shall be conditioned upon the jurisdiction generating solid waste developing and being actively involved in, by July 1, 1992, a strategy for meeting the state-wide goal of waste reduction by July 1, 1996.

O.C.G.A. § 12–8–24(c) (Supp.1994) (the "transportation restriction"). The transportation restriction is also set forth in the EPD solid waste regulations. Ga.Comp.R. & Regs. r. 391–3–4–.06(3)(a)(8.) (1993). Stips, ¶ 20.

### 40.

O.C.G.A. § 12–8–24(c) (Supp.1994) and Ga. Comp.R. & Regs. r. 391–3–4–.06(3)(a)(8.) condition any permit for the transportation of municipal solid waste from a jurisdiction generating solid waste to a municipal solid waste disposal facility in another county upon the generating jurisdiction's developing and being actively involved in a strategy for meeting the state-wide goal of waste reduction by July 1, 1996. Stips, ¶ 69.

### 41.

EPD can enforce the provisions on O.C.G.A. § 12–8–24(c) by revoking the permit by rule of transporters who violate the

provision, or by fining such transporters. Reheis Deposition, at 45.

42.

In many cases, the local jurisdiction responsible for planning is also the transporter of the solid waste (i.e., the City of Atlanta). Reheis Deposition, at 46.

43.

The Director of EPD is aware of no imminent enforcement actions pending or anticipated against solid waste transporters under § 12–8–24(c). The Director could recall no enforcement action taken to date under this Code Section. Reheis Deposition, at 42.

44.

Many cities and counties in Georgia have complete and approved solid waste management plans. (Director's Exhibit 15). As of July 5, 1994, approximately 100 cities and counties, including the City of Atlanta and Fulton County, had not adopted approved solid waste management plans. List of Eligible Governments, P–Ex 8.

45.

There is no regulatory requirement that transporters of solid waste operating under a permit by rule report or supply information on a regular basis to EPD concerning their compliance with § 12–8–24(c). Reheis Deposition, at 47. The Director did not have any information concerning the extent of compliance or noncompliance with this Code Section. Id. at 44.

46.

Thus, although the Act has contained the transportation requirements since 1990, there is no evidence of any attempt by EPD to enforce them against any entity in order to promote or achieve any entity to adopt a waste reduction goal or plan.

J. *EWR'S EFFORTS TO OBTAIN A SOLID WASTE HANDLING PERMIT— THE "GEORGIA NEED" DETERMINATION*

47.

On December 16, 1991, plaintiff EWR filed with EPD an application for permits to construct and operate a biomedical waste incin-erator in Quitman County, Georgia, with a capacity of 42 tons per day. Georgia law requires issuance of an air quality permit, a solid waste management permit and a land-disturbing permit prior to construction and operation of the proposed facility. Stips, ¶ 21.

48.

As part of its application, plaintiff EWR made a showing, based on waste generated and expected to be generated in Georgia, that there was "need" for an incinerator with capacity to dispose of over 200 tons of biomedical waste. Initially, EPD refused to process EWR's application because EPD had in 1990 issued to American Envirecycle, Inc. a permit to incinerate up to 33 tons per day of biomedical waste, and EPD took the position that such permit took care of the "Georgia need." In early 1992 the American Envirecycle project was abandoned, and EPD resumed consideration of the EWR application. Stips, ¶ 22.

49.

At various points in the lengthy permitting process, defendant EPD and plaintiff EWR discussed various methods and conclusions regarding the amount of biomedical waste generated and expected to be generated in Georgia. Stips, ¶ 23.

50.

In May, 1993, plaintiff EWR submitted evidence that there was a "Georgia need" for additional incinerator capacity in the amount of 42.53 tons per day. Stips, ¶ 24; EWR's Certificate of Need, P–Ex 3.

51.

In June, 1993, defendant EPD made a calculation as to the amount of biomedical waste generated and expected to be generated in Georgia, compared that to the existing capacity and determined that there was a "Georgia need" for a facility to handle 25.2 tons of biomedical waste per day. Stips, ¶ 26; Director's Exhibit 11.

52.

In discussing the "Georgia need" issue with EPD, plaintiff EWR consistently maintained, through its officers and through counsel, that the "Georgia need" requirement for

a biomedical waste incinerator permit is clearly unconstitutional as violative of the Commerce Clause. EWR expressed to EPD its reluctance to challenge the statute in federal court but made it clear that a denial of its permit application would leave it no other option. Stips, ¶ 25.

53.

In June, 1993, defendant EPD again made a calculation as to the amount of biomedical waste generated and expected to be generated in Georgia, compared that to the existing capacity and determined that there was a "Georgia need" for a facility to handle 25.2 tons of biomedical waste per day. Stips, ¶ 26; Biomedical Waste Treatment/Disposal Capacity Need in Georgia, P–Ex 13.

54.

The Director, through his staff, advised plaintiff EWR that defendant EPD would issue a permit to incinerate up to 25.2 tons per day, if EWR would commit not to challenge the constitutionality of the statute in federal court. EWR decided to modify its application to seek a permit for 25.2 tons per day capacity and to accept the permit as offered by EPD, even though it authorized less capacity than sought by EWR, because of EWR's interest in moving forward with this project. As requested by EPD, EWR agreed not to challenge the constitutionality of the permit as issued but advised EPD that EWR could not honor this agreement if the permit were appealed by local opponents of the project. Stips, ¶ 27.

55.

On July 8, 1993, defendant EPD issued solid waste handling permit No. 118–003P(Inc) to plaintiff EWR, authorizing construction and operation of an incinerator handling up to 25.2 tons of biomedical waste per day. On that same date, EPD also issued an air quality permit and a land-disturbing permit to EWR. Stips, ¶ 28; EWR's Solid Waste Handling Permit, P–Ex 14.

56.

O.C.G.A. § 12–8–24(b)(1) was applied by defendant EPD to limit the capacity of plaintiff EWR's facility to the incineration of not more than 25.2 tons per day, based on EPD's determination that a need exists for capacity to burn only 25.2 tons per day of biomedical waste generated and expected to be generated in Georgia. Stips, ¶ 67.

## K. EWR'S EFFORTS TO OBTAIN A SOLID WASTE PERMIT—THE PLANNING REQUIREMENTS

57.

The Act imposes numerous procedural prerequisites to issuance of a solid waste handling facility permit. The proposed facility must comply with local zoning and land use ordinances, O.C.G.A. § 12–8–24(g) (Supp. 1994); the local government must hold a public meeting before any siting decision, O.C.G.A. § 12–8–26(b) (1992); and the applicant must advertise the submission of the permit application, O.C.G.A. § 12–8–32(a) (1992). After defendant EPD has determined that the location is a suitable site for the proposed facility, the applicant must advertise that fact, and the host local government must initiate the facility issues negotiation process. O.C.G.A. § 12–8–32(c) (1992). A permit cannot be issued until a prescribed process of negotiation with local landowners and other interested persons has been completed. O.C.G.A. § 12–8–32(d) (1992). Stips, ¶ 29.

58.

In the case of the EWR permit, the facility issues negotiation process was initiated and completed, with the parties thereto negotiating an agreement which addressed the hours of operation, the routes for truck traffic, local recycling efforts, and other concessions by EWR to local concerns. Stips, ¶ 30; Facilities Issues Agreement, P–Ex 9.

59.

The solid waste permitting process is also contingent upon the solid waste planning process. The Act requires that each city and county in Georgia must develop or be included in an approved local or regional comprehensive solid waste management plan no later than July 1, 1993. O.C.G.A. § 12–8–31.1(a) (Supp.1994). After July 1, 1992, no permit can be issued for any solid waste facility, public or private, unless the local government where the facility is to be locat-

**1546**

ed is part of an approved solid waste management plan. O.C.G.A. §§ 12–8–24(g) (Supp.1994); 12–8–31.1(e) (Supp.1994). Stips, ¶ 31.

**60.**

Quitman County, with the cooperation and assistance of EWR, went through the long and involved process of adopting a local solid waste management plan in accordance with the plan procedures developed by the Georgia Department of Community Affairs ("DCA"). These procedures require local governments to hold public hearings and require the Regional Development Center (the "RDC") and DCA to approve the local solid waste management plan. Stips, ¶ 32; Quitman County Solid Waste Management Plan, P–Ex 10.

**61.**

Quitman County held the requisite public hearings and followed all required procedures, starting with the initial public hearing held on October 8, 1992. The Quitman County Solid Waste Management Plan includes the EWR facility. Stips, ¶ 33; Quitman County Solid Waste Management Plan, P–Ex 10.

**62.**

The Quitman County Solid Waste Plan was approved by the county commissioners, approved by the RDC and, after certain revisions were made, approved by DCA. Prior to issuance of the final letter of approval from DCA, certain opponents of the project filed suit in the Superior Court of Fulton County, seeking to enjoin the issuance of the DCA approval of the Quitman County Solid Waste Management Plan. The Superior Court of Fulton County, the Honorable Frank M. Eldridge presiding, denied the request for a temporary restraining order in open court and, by a written Order entered on September 8, 1993, denied the request for injunctive relief and for mandamus. On July 2, 1993, Commissioner Jim Higdon issued to EPD a letter confirming that Quitman County had an approved Solid Waste Management Plan and that, as a result, EPD was authorized to issue permits to facilities in Quitman County. Stips, ¶ 34; Letter from Ralph Balkcom, P–Ex 5; Letter from James Higdon, P–Ex 6.

**63.**

Other cities and counties in Georgia have gone through the process of obtaining approval for their solid waste management plans. As with Quitman County, the solid waste management plans have in many instances become the focus of local political controversies dealing with solid waste. As of June 1, 1994, DCA has approved the solid waste plans of 587 cities and counties, out of a total of 695 local governments. Cities and counties without approved solid waste management plans include the City of Atlanta and Fulton County. Stips, ¶ 35; [List of Eligible Governments, P–Ex 8].

**64.**

The amount of biomedical waste generated in any given community and in Georgia as a whole is only a tiny fraction (less than one percent) of the total Georgia solid waste stream. Stips, ¶ 36.

**65.**

In December, 1993, EPD wrote EWR a letter which advised EWR of the planning requirements prerequisite to the obtaining of a solid waste facility permit. This letter stated that the planning demonstrations must be made prior to issuance of a permit and that the permit would be limited to receipt of waste from those jurisdictions for which planning demonstrations had been made. Stips, ¶ 37.

**66.**

In the course of the permitting process, EWR contended, on several grounds, that EWR was not required to submit planning compliance letters from all jurisdictions in which any potential customers are located. EWR did submit letters from the governing bodies of Habersham County and all municipalities located within Habersham County, certifying that they had approved solid waste management plans and that they are each actively involved in and have a strategy for meeting the State's waste reduction goal. EWR also submitted, through counsel, information published by the State of Florida which demonstrated that Florida has a strategy for meeting Florida's waste reduction

goal, and that Florida's strategy is more ambitious than Georgia's. Stips, ¶ 38; Letter from Dick Watson, P–Ex 7; Letter from Patricia Barmeyer, P–Ex 4.

67.

Based on the submissions from Habersham County and its municipalities and the information regarding Florida, EPD concluded that EWR had satisfied the Georgia planning requirements and the out-of-state planning requirements of the Act and the regulations. EPD construed the requirements in O.C.G.A. § 12–8–24(g), § 12–8–31.1(e)(3) and Ga.Comp.R. & Regs. r. 391–3–4–.02(10) only as threshold prerequisites for issuance of a permit. Since EWR had no commitments from any customers to send waste to its facility, EPD concluded that there was no waste "destined for" the facility within the meaning of O.C.G.A. § 12–8–24(g), § 12–8–31.1(e)(3) and Ga.Comp.R. & Regs. r. 391–3–4–.02(10). EPD concluded that § 12–8–24(g), § 12–8–31.1(e)(3) and Ga.Comp.R. & Regs. r. 391–3–4–.02(10) did not require any limitation on the permit, and EPD did not condition EWR's permit to receipt of waste only from those jurisdictions for which the planning demonstration had been made. Stips, ¶ 39; Written Direct Testimony of Watson, P–Ex 53 at 27.

L. *THE ADMINISTRATIVE APPEAL OF EWR'S PERMIT*

68.

After the issuance of EWR's permit on July 8, 1993, a timely appeal of the permit was filed with the Board of Natural Resources by the Legal Environmental Assistance Foundation, Inc. ("LEAF"), and several residents of Quitman County (collectively, the "Opponents"). The appeal was heard by Mark A. Dickerson, the Administrative Law Judge appointed by the Board of Natural Resources (the "ALJ"), in accordance with O.C.G.A. § 12–2–2(c)(2) and (3) (Supp.1994) and the Georgia Administrative Procedure Act, O.C.G.A. § 50–13–13 (1990) (the "APA"). Stips, ¶ 40.

69.

In the administrative appeal the Opponents raised no issues regarding the environmental aspects of the permit. The issues raised on the administrative appeal dealt only with the questions whether there was a "Georgia need" for the facility for Georgia waste and whether the planning requirements in the statute and regulations had been satisfied. Stips, ¶ 41; Joint Prehearing Submission, P–Ex 38.

70.

The ALJ conducted prehearing proceedings and then held an evidentiary hearing which lasted five days. The ALJ entertained legal arguments both orally and in post-hearing briefs and, on January 3, 1994, issued a Final Decision affirming the issuance of the permit to EWR for the facility in Quitman County, Georgia. Stips, ¶ 42; Final Decision of the ALJ, P–Ex 15.

71.

The ALJ heard detailed evidence from the Opponents, from EPD and from EWR concerning the amount of biomedical waste generated and expected to be generated in Georgia and concerning the amount of disposal capacity presently available in Georgia. The ALJ concluded that there is a "Georgia need" for the capacity of the EWR facility greater than the amount actually permitted by EPD. Stips, ¶ 43; Final Decision of the ALJ, P–Ex 15 at 13.

72.

Certain of the legal issues raised by the Opponents were resolved by the ALJ during the course of the hearing on a motion by EWR and EPD at the close of the Opponents' case. [Administrative Hearing Transcript, P–Ex 16, Volume IV at 68–109.] At that time, the ALJ ruled that EPD had been correct in not considering, as part of the "presently available" capacity to dispose of biomedical waste, the capacity of the biomedical waste incinerator at the Medical Center of Central Georgia ("MCCG") in Macon. [*Id.*, Volume IV at 101.] The ALJ noted in his Final Decision that the facility was not considered because a local ordinance prohibits it from accepting biomedical waste from outside the county in which it is located.

Stips, ¶ 44; Final Decision of the ALJ, P–Ex 15 at 11, n. 19.[1]

### 73.

In his Final Decision, the ALJ considered as disposal capacity "presently in existence" the capacity of landfills to accept the total amount of biomedical waste generated by small quantity generators in Georgia. Final Decision of the ALJ, P–Ex 15 at 13.

### 74.

The ALJ also ruled at the close of the Opponents' case that the Opponents had failed to demonstrate that the permit as issued by EPD violated the planning requirements of O.C.G.A. § 12–8–24(g) (Supp.1994). Stips, ¶ 45; Administrative Hearing Transcript, P–Ex 16, Volume IV at 96–100.

### M. *THE APPEAL TO SUPERIOR COURT*

### 75.

After issuance of the Final Decision of the ALJ affirming the Permit, the Opponents filed an appeal to the Superior Court of Quitman County. [Petition for Judicial Review, P–Ex 39.] No environmental issues were raised in Superior Court. The Opponents sought reversal or modification of the permit on two issues of law, as follows:

(1) The Opponents contended that the Director and the ALJ erred in refusing to consider the capacity of the biomedical disposal facility of MCCG in determining "Georgia need" under the provisions of O.C.G.A. § 12–8–24(b)(1) (Supp.1994); and

(2) The Opponents contended that the Director and the ALJ erred in regarding the requirements of O.C.G.A. § 12–8–24(g) as being merely "threshold" requirements and had abused their discretion in not limiting the permit to receipt of waste from those jurisdictions for which the planning demonstrations had been made.

[LEAF's Brief in Support of Petition for Judicial Review, P–Ex 42.] Both defendant EPD and plaintiff EWR responded to the appeal and filed briefs contending that the issuance of the permit was proper in all respects and that the decision of the ALJ should be affirmed. Stips, ¶ 46; Response of EWR to Petition for Judicial Review, P–Ex 41; Director's Response to Petition for Judicial Review, P–Ex 40; Response of EWR to Appellants' Brief in Support of Petition for Judicial Review, P–Ex 43; Brief of Director in Response to the Appellants' Brief in Support of Petition for Judicial Review, P–Ex 44.

### 76.

A hearing was held on April 29, 1994 before the Honorable Lowrey S. Stone, Judge of the Superior Courts, Pataula Judicial Circuit, at which time counsel for all parties presented oral arguments. Stips, ¶ 47.

### 77.

At this hearing the Superior Court expressed its objection to the prospect of waste being imported into Quitman County to EWR's facility without any geographical limitations. The following are excerpts from statements made by the Superior Court at the hearing:

"I can't see a legislative intent there, Mrs. Cole, that it should be open-ended, and that's what the Administrative Law Judge was in effect holding, that once just a few of them made these certifications they could start taking it from everywhere. And I—I certainly don't think the Legislature intended that." [Superior Court Hearing Transcript, P–Ex 18 at 24.]

"But to say that is simply a—a threshold thing and is—and from there on is open-ended, that is—that's taking in a lot of territory and burdening the State of Georgia with a—with a potential deluge of waste from other states without complying with that and, frankly, the Court cannot read that legislative intent into the statute." [*Id.* at 27.]

---

1. At the hearing, the ALJ ruled that the issuance of EWR's permit should be evaluated based on the facts existing at the time of permit issuance and not on any changes in the facts regarding MCCG in Macon which may have occurred since permit issuance. This ruling of the ALJ was not raised by LEAF in its appeal to the Superior Court. LEAF's Petition for Judicial Review, P–Ex 39.

"Are you just going to take Alabama's waste without any kind of showing and any kind of determination? I don't think that's due process of law." [*Id.* at 50.]

"Do—do you realize the enormity of—of the amount of waste that would be coming in there without any further supervision, without any further control?" [*Id.* at 52.] Stips, ¶ 48.

78.

After the hearing, the parties submitted briefs on potential Commerce Clause and preemption issues, as requested by the Superior Court. Supplemental Brief of Director, P–Ex 45; Post–Hearing Brief of EWR, P–Ex 46; Supplemental Post–Hearing Brief of EWR, P–Ex 48; Appellants' Supplemental Brief, P–Ex 47.

## N.  *THE DECISION OF THE SUPERIOR COURT*

79.

By an Order entered May 25, 1994, the Superior Court reversed the decision of the ALJ and reversed the issuance of the permit to plaintiff EWR. Stips, ¶ 49; Final Order of Superior Court, P–Ex 17.

80.

The Court held that the ALJ and EPD erred in refusing to consider the capacity of MCCG (19 tons per day) in determining "Georgia need" and that the ALJ and EPD erred in not limiting the permit to receipt of waste from jurisdictions for which planning requirements had been met. Stips, ¶ 50; Final Order of Superior Court, P–Ex 17.

81.

O.C.G.A. § 12–8–24(g) (Supp.1994), O.C.G.A. § 12–8–31.1(e)(3) (Supp.1994), and Ga.Comp.R. & Regs. r. 391–3–4–.02(10) (1993) have been applied by the Superior Court to limit the waste which EWR's facility may handle to waste from only those Georgia jurisdictions which had demonstrated at the time of permit issuance that they are part of an approved solid waste plan and are actively involved in and have a strategy for meeting the state-wide goal of waste reduction by July 1, 1996. Stips, ¶ 68.

82.

After receipt of the Court's order, EWR and even EPD (through the Director) requested that the Superior Court amend its Order, to provide that the matter was not only reversed but also remanded for further proceedings not inconsistent with the Order. EPD joined in that request. By an Order entered June 3, 1994, the Superior Court refused to amend or modify its Order. Stips, ¶ 51; Letter from Patricia Barmeyer, P–Ex 49; Letter from Brenda Cole, P–Ex 50; June 3, 1994 Order, P–Ex 51.

83.

The permit issued by EPD and the decision of the ALJ have been reversed (with no remand) by the Superior Court of Quitman County. Stips, ¶ 60; Final Order of Superior Court, P–Ex 17; June 3, 1994 Order, P–Ex 51.

84.

Pursuant to O.C.G.A. § 50–13–20 (1990) and O.C.G.A. § 5–6–35(a)(1) and (b) (Supp. 1994), both EWR and the Director filed petitions for discretionary review of the decision of the Superior Court on June 24, 1994. On July 14, 1994, the Court of Appeals entered orders granting EWR's and the Director's petitions for discretionary appeal. EWR and the Director have filed notices of appeal, and the costs in Superior Court have been paid by EWR. When discretionary review is granted, the filing of a timely notice of appeal is a supersedeas of the judgment of the Superior Court upon payment of all costs in Superior Court by the appellant(s). O.C.G.A. § 5–6–46(a) (Supp.1994). Stips, ¶ 52; EWR's Petition for Leave to Appeal, P–Ex 19; Director's Application for Discretionary Appeal, P–Ex 20; LEAF's Response to Petitions for Appeal, P–Ex 21.

85.

Thus, although EPD and the ALJ were satisfied that EWR had satisfied Georgia's "need" restrictions and planning requirements, the Superior Court reversed the ALJ and the EWR permit and refused to remand the issues back to the ALJ and EPD for further consideration. Plaintiff EWR contends that the Georgia statutes are not only

unconstitutional on their face but applied in an unconstitutional manner by the Superior Court in violation of the Commerce Clause of the United States Constitution.

## O. GEORGIA'S HISTORY OF DISCRIMINATORY REGULATION OF INTERSTATE MOVEMENT OF SOLID WASTE

### 86.

In 1971, Georgia passed a statute which prohibits the movement of waste from any county in Georgia to a landfill in another county or from any other state, unless both the generating county and the county of disposal give their permission. O.C.G.A. § 36-1-16(a) (1993); Ga.Laws 1971, p. 445. Stips, ¶ 53.

### 87.

In 1988 the General Assembly enacted the "special solid waste" provisions of the solid waste law. Ga.Laws 1988, p. 1965. By this amendment, Georgia created a separate category of waste which was defined to mean out-of-state waste, see O.C.G.A. § 12-8-22(37) (1992), and set up a separate and cumbersome process to obtain a permit to handle out-of-state waste.

On August 11, 1992, Chief Judge Wilbur Owens, in the federal District Court for the Middle District of Georgia, held that Georgia's "special solid waste" statutes in the Comprehensive Waste Management Act were unconstitutional as violative of the Commerce Clause in Southern States Landfill, Inc. v. Georgia Dep't of Natural Resources, 801 F.Supp. 725 (M.D.Ga.1992). Those Georgia statutes have since been repealed. Ga. Laws 1993, p. 399, § 7. Stips, ¶ 54.

### 88.

The special solid waste law (held unconstitutional) contained the following subsection:

After July 1, 1992, the owner or operator of a facility proposing to handle special solid waste shall provide certification that the jurisdiction generating the special solid waste to be handled has a strategy for and is actively involved in meeting planning requirements and a waste reduction goal that are equivalent to the planning requirements and the waste reduction goal of this part.

O.C.G.A. § 12-8-27(f) (1992). When the General Assembly amended the Comprehensive Waste Management Act in 1993, it repealed Section 12-8-27 in its entirety but incorporated into the planning requirements, Section 12-8-24(g), a revised version of the former Section 12-8-27(f), so as to require the planning certifications for both in-state and out-of-state generating jurisdictions. Ga.Laws 1993, pp. 402-07.

### 89.

The codified statement of legislative intent in the Comprehensive Solid Waste Management Act of 1990 (the "Act") is as follows:

[T]he director of the Environmental Protection Division of the Department of Natural Resources shall, in exercising any authority granted in this part, recognize that the states which share common borders with Georgia also share the vital natural resources of clean air, clean surface waters, and clean ground waters which flow across those common borders and that, therefore, those bordering states have a mutual interest with Georgia to manage solid waste in a manner that does not threaten to contaminate the shared natural resources. The director shall also recognize, however, that such mutual interest may not exist between Georgia and states which do not share common borders and natural resources with it. Therefore, the director is instructed to be particularly mindful of the need to monitor, inspect, and regulate closely that solid waste generated from sources located in states not sharing common borders and natural resources with Georgia.

O.C.G.A. § 12-8-21(e) (1992 & Supp.1994). Stips, ¶ 55.

### 90.

As enacted in 1990, the Act includes provisions restricting the issuance of solid waste permits to facilities which have made a showing that the host jurisdiction and all Georgia jurisdictions whose waste is destined for the facility have complied with the Georgia plan-

ning requirements. O.C.G.A. § 12–8–24(g) (Supp.1994). Stips, ¶ 56.

91.

In 1993, the General Assembly amended the Act to require the planning showing even from out-of-state jurisdictions whose waste is destined for a facility seeking a solid waste permit. O.C.G.A. § 12–8–24(g) (Supp.1994). Stips, ¶ 57.

92.

In processing plaintiff EWR's application, defendant EPD has implemented the "Georgia need" restriction for a biomedical waste incinerator permit. In applying that provision, EPD initially refused to process the application. Subsequently, when EPD made a determination that there was a "Georgia need" for a facility with 25.2 tons of capacity, EPD required EWR to amend its application to seek less capacity than the operating capacity of the facility, before a permit would be issued. Stips, ¶ 58; Biomedical Waste Treatment/Disposal Capacity Need, P–Ex 13. EPD issued the Permit to EWR for a facility with 25.2 tons capacity.

93.

In applying the planning provisions of the Act, defendant EPD gave a limited construction to the planning requirements in O.C.G.A. § 12–8–24(g), by requiring the planning demonstration only from those jurisdictions from which waste was committed to go to the proposed facility at the time of issuance of the permit (of which there were none), and by not limiting EWR's permit to receipt of waste only from jurisdictions for which the planning certifications had been provided. Stips, ¶ 59; EWR's Solid Waste Handling Permit, P–Ex 14.

### P. CURRENT STATUS OF THE QUITMAN COUNTY PLAN

94.

On June 8, 1993, the Board of Commissioners of Quitman County adopted the Solid Waste Management Plan for Quitman County (the "Quitman County Plan") as approved by the Georgia Department of Community Affairs on June 2, 1993. [Letter from Ralph Balkcom, P–Ex 5.] The Quitman County Plan includes the proposed EWR facility and, by agreement with EWR, the Quitman County Plan provides that EWR will arrange for the transportation of Quitman County household waste and that EWR will pay for recycling containers for use in Quitman County. Stips, ¶ 61; Quitman County Solid Waste Management Plan, P–Ex 10 at 17.

95.

On June 14, 1994, the Board of Commissioners of Quitman County (the "Board") adopted a resolution approving proposed amendments to the Quitman County Plan which would delete the proposed EWR biomedical waste incinerator from the Solid Waste Management Plan. Stips, ¶ 62.

96.

Before any proposed amendments to the Quitman County Plan can become final and effective, the following procedures and events must occur:

• the Board must submit additional information to the Lower Chattahoochee Regional Development Commission (the "RDC"), including information as to how (by taxes or otherwise) Quitman County intends to finance the proposals of the plan, including the 10–year disposal capacity and 25 percent waste reduction elements of the plan;

• the RDC must hold a regional public hearing on the proposed amended plan, after providing notice of the proposed amendment to contiguous local governments and affected state agencies;

• the RDC must review and approve of the proposed amended plan;

• the Georgia Department of Community Affairs must review and approve of the proposed amended plan;

• the Board must officially adopt the proposed amended plan.

By law, the above procedures require a minimum of sixty days for completion, after submission of all necessary information to the RDC for review. Stips, ¶ 63.

97.

On July 5, 1994, by a letter from the RDC, the Board was advised that additional docu-

mentation must be submitted before the RDC would proceed to hold the required regional hearing. Among the additional items required is a statement that the Board will implement the proposals of the plan by taxes or other means. Stips, ¶ 64; Letter from Ron Starnes, P–Ex 12.

98.

As of July 11, 1994, the RDC had not received any additional information or submittals from the Board in connection with the proposed amendment to the Quitman County Plan. Stips, ¶ 65; Letter from Ron Starnes, P–Ex 12.

99.

At the present time, the original Quitman County Plan, adopted June 8, 1993 remains in force and effect. Stips, ¶ 66; Letter from Ron Starnes, P–Ex 12.

100.

O.C.G.A. § 12–8–24(b)(1) was applied by EPD to limit the capacity of EWR's facility to the incineration of not more than 25.2 tons per day, based on EPD's determination that a need exists for capacity to burn only 25.2 tons per day of biomedical waste generated and expected to be generated in Georgia. Stips, ¶ 67.

101.

O.C.G.A. § 12–8–24(g) (Supp.1993), O.C.G.A. § 12–8–31.1(e)(3) (Supp.1993), and Ga.Comp.R. & Regs. r. 391–3–4–.02(10) (1993) have been applied by the Superior Court to limit the waste which EWR's facility may handle to waste from only those Georgia jurisdictions which had demonstrated at the time of permit issuance that they are part of an approved solid waste plan and are actively involved in and have a strategy for meeting the state-wide goal of waste reduction by July 1, 1996. Stips, ¶ 68.

102.

O.C.G.A. § 12–8–24(c) (Supp.1993) and Ga. Comp.R. & Regs. r. 391–3–4–.06(3)(a)(8.) condition the issuance of any permit for the transportation of municipal solid waste from a jurisdiction generating solid waste to a municipal solid waste disposal facility in another county upon the generating jurisdiction's developing and being actively involved in a strategy for meeting the state-wide goal of waste reduction by July 1, 1996. Stips, ¶ 69.

103.

Waste is not "destined for" a proposed solid waste facility within the meaning of O.C.G.A. § 12–8–24(g) and § 12–8–31.1(e)(3) unless the proposed facility has binding commitments to accept the waste. At the time of the issuance of the Permit, EWR had no binding contracts or other commitments to accept and dispose of waste at its facility. Therefore, there was no waste "destined for" the EWR facility, and EWR was not required by the Act to make any demonstration that any jurisdictions, in-state or out-of-state, had complied with the planning requirements. Stips, ¶ 70; Director's Exhibit 26, p. 27.

104.

Even if the Bibb County Ordinance might be held invalid, as preempted by State law or as violative of the Commerce Clause, in a proceeding brought by MCCG or some other party with standing to challenge the ordinance, the capacity of the MCCG facility is not capacity which is "presently in existence" within the meaning of O.C.G.A. § 12–8–24(b)(1) and thus should not be considered in determining the need for the EWR facility. Stips, ¶ 71.

## Q. *PURPOSE OF THE "GEORGIA NEED" PROVISION*

105.

Defendant EPD had a key role in the drafting and passage of the bill that became the Comprehensive Solid Waste Management Act (the "Act"). 1994 Reheis Deposition, P–Ex 30 at 7. The "Georgia need" provision was not included in the Act as passed but was included in a 1990 amendment to the Act. Ga.Laws 1990, p. 1222, § 1. The bill with the "Georgia need" provision was introduced by a legislator to block a specific facility. Georgia EPD took a neutral stance with regard to this bill. 1994 Reheis Deposition, P–Ex 30 at 7–9.

106.

As stated in a letter dated June 30, 1994 from counsel for the Director, the purpose of the "Georgia need" provision is "[t]o limit the volume of biomedical waste handled, transported, and disposed of within Georgia by establishing a cap on the quantity of biomedical waste that may be treated using thermal treatment technology." Letter from Alan Gantzhorn, P–Ex 29.

In his deposition on July 1, 1994, the Director acknowledged that this purpose may not be accomplished because:

if somebody were bringing waste from outside of Georgia and using capacity that exists in Georgia for incineration, and somebody inside Georgia was generating waste and they also wanted to incinerate their waste, and there was not capacity inside Georgia, they may have to take it somewhere else, or they may have to move it to a different—a hospital facility that was willing to take waste from elsewhere in Georgia.

And, therefore, the—under that scenario, the handling and transport might be increased. It wouldn't be limited, necessarily, if someone was bringing in waste from out of state. But the amount being disposed by incineration would be limited.

1994 Reheis Deposition, P–Ex 30 at 23–24.

107.

In his deposition on July 1, 1994, the Director testified that he continues to have a concern that EPD cannot control and regulate out-of-state generators and that those generators might not follow EPD's regulations with respect to the waste they send to Georgia for disposal. 1994 Reheis Deposition, P–Ex 30 at 28–29.

108.

In his deposition on July 1, 1994, the Director testified that the purpose of the "Georgia need" provision is "to reduce the hazards and the exposures by putting limits on the amount of air quality increments that would be used by incinerators." 1994 Reheis Deposition, P–Ex 30 at 13–14.

109.

The "Georgia need" requirement does not "limit in any way the generation of biomedical waste." 1994 Reheis Deposition, P–Ex 30 at 14. EPD's efforts on solid waste reduction have focused on households and commercial and industrial waste, but not on biomedical waste. *Id.* at 27. Because of the overriding health and safety and cost issues involved, the Director acknowledges that EPD's programs will have little impact on the amounts of biomedical waste generated. *Id.* at 26–27. The total amount of biomedical waste generated in Georgia must necessarily be handled and transported in Georgia even if it is transported for disposal in another State.

In short, the Georgia need requirement restricting the amount of biomedical waste that can be disposed of in Georgia does not limit or in any way reduce the amount of biomedical waste generated in Georgia.

110.

In seeking to achieve the purpose of limiting the volume of biomedical waste handled, transported and disposed of within Georgia, EPD did not consider any "other alternatives to achieve that purpose." 1994 Reheis Deposition, P–Ex 30 at 27.

111.

House Bill 1169 as passed by the House and Senate in the 1992 Session of the General Assembly amended the "Georgia need" provision so as to make it yet more difficult to make a showing of "Georgia need" for a biomedical waste incinerator. However, the bill as passed also included a floor amendment which would have relieved an existing commercial biomedical waste treatment facility (of which there was at that time only one, the BFI facility) from the requirement to show "Georgia need" in order to expand its facility House Bill 1169, P–Ex 24. Governor Miller vetoed the bill, stating that, "This could open the flood gates for biomedical wastes from other states to be imported to Georgia for incineration and would nullify the original intent of the Comprehensive Solid Waste Management Act. Veto, P–Ex 25. To preserve the integrity of Georgia's environment and Georgia's environmental laws, I

hereby veto House Bill 1169." The veto message also states, "The intention of the legislature in enacting the Comprehensive Solid Waste Management Act was to limit commercial biomedical waste disposal capacity to what Georgia hospitals, clinics and doctors need." *Id.*

112.

Effective June 27, 1993, Ga.Comp.R. & Regs. r. 391–3–4–.06 was amended to provide that on-site processing and thermal treatment facilities (usually found at hospitals) "shall be deemed to have a solid waste handling permit" if they notify the State within 30 days of commencement of such activities and if they follow other general operating requirements contained in the regulations. r. 391–3–4–.06(1) (1993). This "permit by rule" allows a hospital to construct and operate an on-site incinerator without any public input or environmental review. Also effective June 27, 1993, Ga.Comp.R. & Regs. r. 391–3–4–.06 was amended to define an "on-site processing and thermal treatment facility" as "a facility that processes or thermally treats, no less than 75 percent, by weight, solid waste generated at the permit-by-rule facility location or facilities owned by the same person who owns the property containing the permit-by-rule facility." r. 391–3–4–.06(3)(d)(1.) (1993).

Prior to this amendment, on-site hospital incinerators were not permitted to accept for disposal waste generated off-site (unless generated at other facilities owned by the owner of the incinerator) without obtaining a solid waste permit to operate as a commercial biomedical waste treatment facility. r. 391–3–4–.15(6)(e) (1992). As a result, the 1993 amendments now allow any on-site hospital incinerator to increase its capacity by accepting waste from off-site up to an additional 33 percent without any public input or environmental review by defendant EPD.

113.

The 1993 amendment to the solid waste regulations allowing hospital incinerators to increase their capacity by up to 33 percent, without any public input or environmental review or showing of need, directly contradicts the Director's purported purpose (behind Georgia's need restriction) of limiting the amount of biomedical waste handled, transported, and disposed of in Georgia. The 1993 amendment creates and authorizes additional capacity for the disposal of biomedical waste in Georgia by thermal treatment and thus increases the amount of biomedical waste handled, transported, and disposed of in Georgia on-site hospital incinerators. For example, EWR currently disposes of out-of-state biomedical waste at Georgia Baptist Hospital's incinerator.

## R. *PURPOSE OF THE PLANNING REQUIREMENTS*

114.

In a deposition on November 19, 1991, John Taylor, Chief of the Land Protection Branch of EPD testified as follows:

Q: Are there any other procedures that you can think of that were used to address the department's concerns in allowing special solid waste to come into the State of Georgia or solid waste to come in the State of Georgia?

A: Well, there will be July the 1st of this coming year, '92.

Q: What will that be?

A: That's when the planning requirements take place in Georgia and that's when we have mandated, I guess, that every local government put in place a plan to project their needs for 10 years.

Again, the assumption being that we want to have the jurisdiction to plan to have enough capacity to handle up to 10 years. And at that point we will also be concerned that out-of-state waste is not impacting that planned process, that some jurisdiction doesn't think they have 10 years capacity on their site and somebody has agreed to provide them capacity and all of a sudden it's consumed by out-of-state waste. So I guess this comes down to allocating our resources to solve our problems, not some other state's problems.

Taylor Deposition, P–Ex 28 at 44.

115.

In a letter dated June 30, 1994 from counsel for the Director, the stated purpose of the

"planning requirements" is "[t]o assist EPD in planning to achieve the State goal for 25 percent reduction of solid waste by gathering information during the permitting process concerning the jurisdictions disposing of biomedical waste at various permitted facilities." Letter from Alan Gantzhorn, P–Ex 29.

116.

In his deposition on July 1, 1994, the Director testified that the planning requirements "allows us to—to know whether the sources of the waste are covered by planning requirements that are equal to or substantially equivalent or in compliance with those of our state law." The Director acknowledged that EPD can and does obtain this information about jurisdictions within the State of Georgia from other sources. 1994 Reheis Deposition, P–Ex 30 at 52.

117.

The only information gathered by EPD pursuant to the planning requirements which is not provided under other provisions of the Act or under the solid waste rules is information from out-of-state waste sources. 1994 Reheis Deposition, P–Ex 30 at 57.

118.

In his deposition on July 1, 1994, the Director testified that if at the time of permit issuance EWR had a contract to accept waste from a generator located in the City of Atlanta, which has not yet adopted an approved solid waste management plan, then EPD would have issued a permit which would have prevented EWR from accepting waste from the City of Atlanta. 1994 Reheis Deposition, P–Ex 30 at 50.

119.

If at the time of permit issuance EWR had a contract with a facility in Alabama and if EWR were unable to show that Alabama has a waste reduction goal and planning requirements substantially equivalent to that of Georgia, then EPD would have issued a permit which would have prevented EWR from accepting waste from the Alabama jurisdiction in which that facility is located. 1994 Reheis Deposition, P–Ex 30 at 50–51.

## S. PURPOSE OF THE TRANSPORTATION RESTRICTIONS

120.

In a letter dated June 30, 1994 from counsel for the Director, the stated purpose of the "transportation restrictions" is "[t]o enable the Director of EPD to coerce local jurisdictions within Georgia to engage in comprehensive solid waste planning." Letter from Alan Gantzhorn, P–Ex 29.

121.

In his deposition on July 1, 1994, the Director testified that "the purpose of this section of the statute [O.C.G.A. § 12–8–24(c)] is to force or coerce or compel the counties to plan for solid waste, to engage in solid waste planning so that they're managing their solid waste as responsibly as possible.... If Piedmont Hospital really wants to take their waste somewhere else and they're not allowed to because whoever was going to transport it can't get a permit to do that, then maybe Piedmont Hospital and everybody like them will put pressure on the City of Atlanta government to go ahead and do their plan." 1994 Reheis Deposition, P–Ex 30 at 35, 39.

122.

It is a condition of the permit of the transporter that it cannot move waste from a jurisdiction without an approved plan into another county for disposal. 1994 Reheis Deposition, P–Ex 30 at 41–42.

123.

In his deposition on July 1, 1994, the Director testified that he did not recall ever taking or threatening any enforcement action against any transporter for violating the condition imposed on its permit-by-rule under the transportation requirements and that he was not aware of any immediate situations in which EPD is planning to enforce the transportation requirements. 1994 Reheis Deposition, P–Ex 30 at 42. Moreover, as testified by Ralph Armistead, the transportation requirements are not being enforced at all. Mr. Armistead cited BFI's daily hauling of biomedical waste from Crawford Long Hospital located in the City of Atlanta to BFI's

disposal facility in Clayton County, Georgia as an example of the widespread disregard of the regulations. Armistead Deposition, P–Ex 34 at 58.

### 124.

In addition, EPD has methods, other than the transportation restriction, to coerce the county or local government jurisdiction to do the required planning. EPD has denied permits and has found the denial of permits for any solid waste facility within a jurisdiction to be an effective tool to promote the passage and adoption of solid waste management plans. 1994 Reheis Deposition, P–Ex 30 at 39–40. EPD has the authority to impose a civil penalty upon a city or county which has violated the Act by failing to adopt an approved solid waste plan. O.C.G.A. § 12–8–30.6(a) (1992). EPD has not contemplated any civil penalty or other enforcement action to force local governments to adopt solid waste plans. 1994 Reheis Deposition, P–Ex 30 at 43.

### T. *IMPACT OF THE CHALLENGED STATUTES AND REGULATIONS ON EWR*

### 125.

The "Georgia need" provision and the "planning requirements", as applied by the Superior Court of Quitman County, have prevented EWR from obtaining a final permit to construct and operate the proposed biomedical waste incinerator.

### 126.

The "Georgia need" provision limits the permitted capacity of EWR's incinerator to an amount based on "Georgia need" and not based on the amount of waste the incinerator could handle if unrestricted. EWR's Solid Waste Handling Permit, P–Ex 14; Biomedical Waste Treatment/Disposal Capacity Need in Georgia, P–Ex 13.

### 127.

The planning requirements require the submission of planning certifications by EWR. O.C.G.A. § 12–8–24(g). If EWR applies for an increase in its permitted capacity, then EWR will have contracts with many customers, both in-state and out-of-state.

Armistead Deposition, P–Ex 34 at 47. If the planning requirements remain, EWR at that time will be required to submit planning certifications for all those customers and if unable to obtain the required planning certifications for some customers' jurisdictions, would receive a permit with a condition prohibiting EWR from honoring its commitments with those customers. 1994 Reheis Deposition, P–Ex 30 at 49–51.

### 128.

The transportation requirements adversely impact EWR's business because they require EWR to segregate the biomedical waste transported to its transfer facility before hauling it to its disposal facility. For example, if EWR's transfer facility has incoming biomedical waste from any customer in a jurisdiction which has not developed an approved waste reduction strategy, such as the City of Atlanta, then EWR would not be authorized to transport the Atlanta customer's waste to its incinerator in Quitman County. As a result, the transportation requirements will require EWR to segregate the incoming waste at its transfer facility based on its geographic origin.

### 129.

The principals of EWR, Mr. Brian Beem and Mr. Dick Watson, have spent two years and more than $575,000 in the project. Watson Affidavit, P–Ex 52 at 2.

### 130.

EWR has entered into contracts for the transportation and disposal of waste in anticipation of a final permit to construct and operate the EWR facility. Transporting biomedical waste to incinerators not owned by EWR returns a significantly lower return to EWR than disposal of waste at EWR's own incinerator, due to higher costs of incineration or the cost of transportation to a more distant facility. Watson Affidavit, P–Ex 52 at 3–4.

### 131.

When EWR's facility is fully operational, the facility will employ 25 employees requiring varying levels of education and experience. Job applications have already been received from over 200 Quitman County resi-

dents. EWR's review of these applications indicates that every position at the facility, except that of plant engineer, could be filled from the Quitman County applicant pool. EWR estimates that it will pay the anticipated 25 employees combined yearly salaries of approximately $625,000 within the first operational year alone. If the facility is not operational, the community will lose these jobs and wages and the taxes to be paid on said wages. Watson Affidavit, P–Ex 52 at 5.

132.

The property tax on the real property for the facility in Quitman County for 1993 was approximately $150. If the facility is constructed, EWR will pay property taxes of approximately $120,000 to Quitman County during its first operating year. Watson Affidavit, P–Ex 52 at 5.

133.

If EWR's facility is constructed and operated, EWR has agreed with Quitman County to provide recycling bins and garbage transportation for all County residents and businesses, training for volunteer Emergency Medical Technicians ("EMTs") resident in Quitman County, which currently has only two EMTs, and a Commissioners' Fund of $25,000 in the first year of the facility's operation, to be used as the County Commissioners deem appropriate. The Commissioners' Fund will increase in uniform increments over a ten-year period to a maximum of $40,000 annually. Watson Affidavit, P–Ex 52 at 5–6.

134.

Once EWR's facility becomes operational, EWR plans to charge less than BFI for incineration services. Without EWR's facility as an option, Georgia generators of biomedical waste will pay BFI's prices or

ship their waste out-of-state, which necessitates the transport of their waste over a longer distance. Watson Affidavit, P–Ex 52 at 9–10.

135.

EWR's collection operation has developed a reusable packaging system for biomedical waste with automatic cleaning and disinfection capability. The reusable containers are provided to EWR's collection operation customers. EWR's system reduces the amount of biomedical waste to be incinerated by approximately 12 percent by eliminating corrugated containers that are now burned. It also provides a safer containment and handling system for waste. EWR's Quitman County facility is designed to handle these reusable containers efficiently while no other facility is so designed. Watson Affidavit, P–Ex 52 at 12.

## II. CONCLUSIONS OF LAW

### A. THE COMMERCE CLAUSE

The United States Supreme Court has held that solid waste is an article of commerce and that the transport and disposal of solid waste constitute interstate commerce. "Whether the business arrangements between out-of-state generators of waste and the . . . operator of a waste disposal site are viewed as 'sales' of garbage or 'purchases' of transportation and disposal services, the commercial transactions unquestionably have an interstate character." *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 359, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992). As a result, the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3, imposes restrictions on a State's ability to regulate such transactions.[2]

2. Building on the seminal decision in *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), the Supreme Court has rendered four decisions in the last two years, each of which declared unconstitutional state and local laws and regulations which interfered with the interstate and intercounty transportation of solid waste. *See C & A Carbone, Inc. v. Town of Clarkstown,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Oregon Waste Systems, Inc. v. Dep't of Envtl. Quality of Oregon,* —— U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13

(1994); *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). Likewise, federal courts in Georgia recently have held certain Georgia statutes and ordinances regulating solid waste unconstitutional under the Commerce Clause. *Diamond Waste, Inc. v. Monroe County,* 731 F.Supp. 505 (M.D.Ga.1990), *aff'd in part and vacated in part,* 939 F.2d 941 (11th Cir.1991); *Mullis Tree Service, Inc. v. Bibb Coun-*

**1558**

The Commerce Clause prevents the States from succumbing to the temptation of isolating themselves from the economic, social and environmental issues of the day. *See Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality,* —— U.S. ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). The United States Supreme Court has held repeatedly that while States are appropriately concerned about protecting the health and safety of their citizens, "[n]o state may attempt to isolate itself from a problem common to the several states by raising barriers to the free flow of interstate trade." *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 338–40, 112 S.Ct. 2009, 2012, 119 L.Ed.2d 121 (1992); *see also Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *Philadelphia v. New Jersey,* 437 U.S. 617, 628, 98 S.Ct. 2531, 2537–38, 57 L.Ed.2d 475 (1978). Therefore, a State cannot discriminate "against articles of commerce coming from outside the State unless there is some reason apart, from their origin, to treat them differently." *Philadelphia v. New Jersey,* 437 U.S. 617, 626–27, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978).

■ The Supreme Court has established a two-step process for evaluating the validity of a statute under the Commerce Clause. *C & A Carbone, Inc. v. Town of Clarkstown,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1347. In a Commerce Clause challenge, the burden is initially on the plaintiff to show that the legislation is discriminating against interstate commerce on its face or in its purpose and effect. *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). The first step of the evaluation is to determine whether the State's regulation of interstate commerce discriminates against interstate commerce or favors in-state economic interests over their out-of-state counterparts. *Carbone,* —— U.S. at ——, 114 S.Ct. at 1682; *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1347. If a statute so discriminates,

it is virtually *per se* invalid unless the State can show that the statute advances a "legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives;" such State purposes are to be strictly scrutinized by the Court. *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1347.

■ In addition, when it is shown that a law was enacted with a purpose to discriminate against interstate commerce, strict scrutiny is also required. A State statute may be discriminatory on its face, in its purpose or in its effect. *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 270, 104 S.Ct. 3049, 3054–55, 82 L.Ed.2d 200 (1984); *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 352–53, 97 S.Ct. 2434, 2446–47, 53 L.Ed.2d 383 (1977).

■ If a statute is not discriminatory, but rather regulates evenhandedly, then the Court must apply the *Pike* balancing test and determine whether the burden on interstate commerce is clearly excessive in relation to the putative local benefits. *Carbone,* —— U.S. at ——, 114 S.Ct. at 1682; *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1347; *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

## B. THE "GEORGIA NEED" REQUIREMENT

### 1. Georgia Need Statute is Discriminatory

■ As outlined above in the factual history, O.C.G.A. § 12–8–24(b)(1) (the "Georgia need" provision) was enacted by the State of Georgia to restrict the influx of biomedical waste from other states into Georgia. The "Georgia need" provision requires EWR, as an applicant for a permit to operate a thermal treatment biomedical waste facility, to "demonstrate to the director that a need exists for the facility for waste generated in Georgia." O.C.G.A. § 12–8–24(b)(1). The

*ty,* 822 F.Supp. 738 (M.D.Ga.1993); *Southern States Landfill, Inc. v. Ga. Dep't of Natural Resources,* 801 F.Supp. 725 (M.D.Ga.1992); *Dia-* *mond Waste, Inc. v. Monroe County, Ga.,* 796 F.Supp. 1511, 1519 (M.D.Ga.1992).

"Georgia need" provision discriminates, on its face and in its purpose and effect, against out-of-state waste because it requires a permit applicant to demonstrate that a need exists for its proposed facility "for waste generated in Georgia." O.C.G.A. § 12–8–24(b)(1) (Supp.1994). So long as there is no demonstrable need for a facility to dispose of Georgia biomedical waste, a permit will not issue, even if there is a clear need for disposal capacity for out-of-state biomedical waste. Therefore, Section 12–8–24(b)(1) has the effect of discriminating against and blocking the disposal of out-of-state biomedical waste in Georgia for no reason other than that Georgia's biomedical waste generators have no need for the disposal capacity sought. The "Georgia need" provision thereby imposes a significant burden on interstate commerce. *See Medigen of Kentucky, Inc. v. Public Serv. Comm'n,* 985 F.2d 164, 166–167 (4th Cir.1993) (requirement that transporter of medical waste obtain a certificate of convenience and necessity "imposes a significant burden on interstate commerce" and violates the Commerce Clause).

The "Georgia need" provision also favors existing Georgia biomedical waste disposal facilities to the detriment of any entity which proposes to construct a biomedical waste disposal facility to handle, in whole or in part, biomedical waste from out-of-state generators. The "Georgia need" provision likewise favors existing commercial disposal facilities to the detriment of consumers who are disadvantaged by the higher prices which result from the lack of competition. Although there is no difference between Georgia's biomedical waste and out-of-state biomedical waste, the "Georgia need" provision discriminates against out-of-state biomedical waste based solely on geographic origin.

On the face of the "Georgia need" provision, Georgia will grant EWR a permit to allow sufficient incinerator capacity to handle the biomedical waste generated in Georgia, but not out-of-state biomedical waste. Like the statutes and ordinances struck down by the United States Supreme Court in *Philadelphia v. New Jersey, Chemical Waste Management,* and *Fort Gratiot,* the "Georgia need" provision is an attempt to isolate Geor-gia from a problem common to the several states by raising barriers to the free flow of interstate trade. *See Chemical Waste Management v. Hunt,* 504 U.S. 334, 338–40, 112 S.Ct. 2009, 2012, 119 L.Ed.2d 121 (1992).

For all of the above reasons, the "Georgia need" provision is unconstitutional, unless the State advances a "legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1347. The State must justify its discrimination "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Any such purpose advanced by the State is subject to the strict scrutiny of the Court in order for the statute to be held constitutional. *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). Hence, in this case, the Court must follow these Supreme Court decisions and apply strict scrutiny to the "Georgia need" statute. *Bacchus Imports,* 468 U.S. at 270, 104 S.Ct. at 3054–55.

The State's articulated purpose of the "Georgia need" provision is to "limit the volume of biomedical waste handled, transported, and disposed of within Georgia by establishing a cap on the quantity of biomedical waste that may be treated using thermal treatment technology." *See* Letter from Alan Gantzhorn, P–Ex 29. First, the State admits that it has not considered any nondiscriminatory alternatives to achieve its stated purposes. 1994 Reheis Deposition, P–Ex 30 at 27.

Second, Section 12–8–24(b)(1) does not address or further the stated purpose of the statute. There is no evidence that limiting thermal treatment of biomedical waste reduces or seeks to reduce the amount of biomedical waste generated. This section

does not effectively limit the volume of biomedical waste handled, transported, and disposed of in Georgia because it does nothing to reduce or limit the amount of biomedical waste generated in Georgia. *Id.* at 14. Instead, the statute allows permits for additional biomedical waste thermal treatment disposal capacity whenever the amount of biomedical waste generated in Georgia increases and makes no attempt to reduce the amount of biomedical waste generated in Georgia.

Third, the need provision in Section 12–8–24(b)(1) does not cap effectively the quantity of biomedical waste that may be treated in Georgia using thermal treatment technology because the defendant EPD does not regulate the capacity of on-site hospital incinerators for biomedical waste. A hospital may construct, at will and without EPD review, an on-site incinerator to dispose of its biomedical waste (and up to 25 percent more waste from other generators), thereby increasing the amount of biomedical waste treated using thermal treatment technology. Stips, ¶ 9.

The statute is drafted so that, in effect, it has no impact on the amount of waste handled or transported in Georgia. If much of the existing Georgia incinerator capacity is used for out-of-state waste, then Georgia waste has to be transported and disposed of in other states, which would result in no reduction in the amount of waste handled or transported in Georgia. 1994 Reheis Deposition, P–Ex 30 at 23–25. Also, despite the alleged purpose of the "Georgia need" statute, Georgia in 1993 increased the capacity of on-site hospital incinerators to accept biomedical waste from other generators by 33 percent of the hospital's total capacity without any showing of need, an increase from the previous 25 percent of capacity limit. This directly contradicts the purported purpose of the "Georgia need" statute and

further confirms that the true purpose of the statute is to restrict the influx of out-of-state biomedical waste into Georgia.

The purported purpose of the "Georgia need" provision to "reduce the hazards and the exposures by putting limits on the amount of air quality increments that would be used by incinerators," as articulated by the Director, 1994 Reheis Deposition, P–Ex 30 at 13–14, also does not survive strict scrutiny because it demonstrates a clear motive by the State to prevent out-of-state biomedical waste from coming into Georgia for economic protectionism. *See Oregon Waste Sys.,* — U.S. at ——, 114 S.Ct. at 1354; *Philadelphia v. New Jersey,* 437 U.S. 617, 628, 98 S.Ct. 2531, 2537–38, 57 L.Ed.2d 475 (1978). If anything, the permit for EWR's facility will enhance Georgia's environment, as it is significantly more advanced than many of Georgia's aging on-site hospital incinerators, which are environmentally substandard.[3]

### 2. *Pike Balancing*

■ Even if the "Georgia need" provision in O.C.G.A. § 12–8–24(b)(1) is not discriminatory on its face or in its purpose or in its effect, the burden on interstate commerce imposed by this provision is " 'clearly excessive in relation to the putative local benefits.' " *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. Under the *Pike* test, if a legitimate local purpose is credibly advanced, "then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* at 142, 90 S.Ct. at 847. The burdens which the "Georgia need" provision imposes upon the movement of biomedical waste in interstate commerce are disproportionate when compared with the alleged benefits, if any, of the provision.

**3.** An almost identical provision in South Carolina's nonhazardous waste regulations, which required a demonstration of "South Carolina need" prior to issuance of a permit for a solid waste facility, was stricken as violative of the Commerce Clause. *Northeast Sanitary Landfill Inc. v. DHEC,* 843 F.Supp. 100 (D.S.C.1992). A similar conclusion, affirming a preliminary injunction, was reached in *Hazardous Waste Treat-*

*ment Council v. South Carolina,* 945 F.2d 781, 791, 791 n. 14 (4th Cir.1991) ("South Carolina has not banned all out-of-state waste but, on full development of the merits, that may prove to be of little relevance"; enjoined need requirement which "permits South Carolina to refuse to allow new construction if all of its waste can be disposed of by exportation").

For example, the alleged "local benefit" from the "Georgia need" provision is to "limit the volume of biomedical waste handled, transported, and disposed of within Georgia by establishing a cap on the quantity of biomedical waste that may be treated using thermal treatment technology." Letter from Alan Gantzhorn, P–Ex 29. However, the "Georgia need" provision for commercial incinerators wholly fails to achieve this "benefit" because EPD does not reduce in any way the amount of biomedical waste generated in Georgia and does not limit in any way the amount of biomedical waste that may be handled and disposed of by the many on-site hospital incinerators.

More importantly, the Director has not demonstrated that a limit on the volume of biomedical waste handled, transported and disposed of within Georgia would benefit the State of Georgia in any legally permissible way. The Director has not shown that accidents occur which would be diminished if the volume of biomedical waste treated by thermal incineration were decreased. If anything, the record shows that thermal incineration, as opposed to landfills, enhances Georgia's environment. Additionally, there is no evidence that biomedical waste generated outside Georgia is different or more dangerous than biomedical waste generated in Georgia. Rather the parties have stipulated that there is no difference between biomedical waste generated in Georgia and biomedical waste generated in other states. As a result, the Director has not asserted credibly a legitimate state purpose to be served by the "Georgia need" provision.

Under the "Georgia need" provision, plaintiff EWR is barred from obtaining a permit for a biomedical waste incinerator in Quitman County, Georgia on the Alabama border, even if several out-of-state generators of biomedical waste within miles of the facility would like to dispose of their waste at the proposed facility. Consequently, the burdens on the interstate movement of biomedical waste are far greater than incidental and do not bear any reasonable relation to the purported purpose. *See Pike*, 397 U.S. at 142. This is particularly true here, where EWR is already disposing of out-of-state waste at Georgia Baptist Hospital's facility and has not been able to obtain the use of any other hospitals' incinerators. In short, the "Georgia need" requirement materially affects interstate commerce. As a result, this provision is unconstitutional under the Commerce Clause. *See Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 444, 80 S.Ct. 813, 816–17, 4 L.Ed.2d 852 (1960); *Medigen of Kentucky, Inc. v. Public Service Commission*, 985 F.2d 164, 166 (4th Cir.1993) (facially nondiscriminatory certification requirement held unconstitutional even under *Pike* balancing test); *see also Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir.1991) ("substantial argument" that the need requirement is unconstitutional).[4]

The *Pike* balancing analysis by the Fourth Circuit in *Medigen*, 985 F.2d 164 (4th Cir. 1993), is particularly apt here. In *Medigen*, West Virginia required a transporter of medical waste to obtain a certificate of convenience and necessity. Before granting the certificate, the West Virginia Public Service Commission was required to take into consideration existing transportation facilities. West Virginia law provided that if the existing facilities were reasonably efficient and adequate, the Commission shall not grant a certificate to the transporter of medical waste. Applying the *Pike* balancing test[5],

---

4. Defendant EPD cites *Chambers Medical Technologies v. Jarrett*, 841 F.Supp. 1402 (D.S.C. 1994), but that decision is factually very different. Also, the *Chambers* Court did not consider whether the provision at issue, even if not facially discriminatory, "favors in-state economic interests over out-of-state interests" and is unconstitutional on that basis. *See Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337 n. 14, 109 S.Ct. 2491, 2500 n. 14, 105 L.Ed.2d 275 (1989); *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080,

2084, 90 L.Ed.2d 552 (1986); *Government Suppliers Consolidating Services, Inc. v. Bayh*, 975 F.2d 1267, 1277 (7th Cir.1992).

5. In *Medigen*, the parties disputed the standard of review, i.e., whether *per se* unconstitutional, strict scrutiny, or *Pike* balancing. Because "the certification requirement is unconstitutional even under the deferential balancing test of *Pike*," the Fourth Circuit found "it unnecessary to decide whether the requirement should be evaluated

the Fourth Circuit held that the burden on interstate commerce imposed by making the transporter make a showing of necessity outweighed the local benefits identified by the Commission, stating as follows:

> The Commission contends that the certification requirement promotes local interests by insuring that service is available throughout West Virginia at reasonable prices. Restricting market entry, however, necessarily *limits* the available service because it limits the number of medical waste transporters from which a medical waste generator can seek service. Moreover, restricting market entry does nothing to insure that services are provided at reasonable prices. Without rate regulation, higher rather than lower prices will more likely result from limiting competition. West Virginia's goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose.
>
> In contrast, other aspects of West Virginia's regulatory scheme do serve that purpose. For example, the Commission requires all transporters of infectious medical waste to offer their services to all medical waste generators within the territories in which they are certified to operate. (J.A. 534–35.) The Commission also regulates the prices transporters charge to their customers. *See* W.Va.Code § 24A–2–4 (requiring common carriers to charge "just and reasonable" rates). These regulatory tools help insure that universal service is provided at reasonable prices. Restricting market entry, on the other hand, does not serve this goal, and hence does not produce the benefits that the Commission urges justify the burden placed on interstate commerce.

*Medigen,* 985 F.2d at 167.

Likewise, "Georgia's need" statute does not address or further its stated purpose for the statute of limiting the amount of biomedical waste transported, handled or disposed of in Georgia. In addition, there are other nondiscriminatory, more effective means to achieve this stated purpose. For example, in Georgia's Comprehensive Waste Management Act, Georgia has adopted a goal to reduce on a State-wide per capita basis the amount of "municipal solid waste" during fiscal year 1992 by 25 percent by July 1, 1996.[6] O.C.G.A. § 12–8–21(c). In O.C.G.A. § 12–8–31.1(a), Georgia requires each city and county to "develop or be included in a comprehensive solid waste management plan not later than July 1, 1993." In O.C.G.A. § 12–8–31.1(d), each city and county in Georgia must also report annually on the status of solid waste management in its jurisdiction. Each annual report must include "the amount of solid waste collected, processed, and disposed of in the area" and "the progress on the reduction in solid waste ... in the planning area since the previous reporting period and total cumulative progress toward meeting the 25 percent reduction goal." O.C.G.A. §§ 12–8–31.1(d)(1) and (2). The annual report shall cover, *inter alia,* the "recycling and composting activities in existence" and "public information and education activities during the reporting period." O.C.G.A. §§ 12–8–31.1(d)(4) and (5).

If Georgia wants to reduce biomedical waste transported, handled and disposed of in Georgia, then Georgia can adopt and/or enforce these laws seeking to reduce the generation of solid waste in Georgia. Georgia could adopt even more specific laws specifically addressing the generation of biomedical waste. If Georgia wants to reduce health or accident risks in the transporting and handling of biomedical waste, Georgia could adopt regulations specifically dealing with special care in transporting, handling and disposal of biomedical waste, which

---

under a strict scrutiny." *Medigen,* 985 F.2d at 166 (4th Cir.1993).

**6.** Georgia's Comprehensive Waste Management Act regulates various forms of solid waste, *inter alia:* (a) biomedical waste; (b) industrial solid waste; (c) municipal solid waste (i.e., garbage, trash and sanitary waste); (d) other solid waste, covering sludge, gaseous material, domestic sew-

age, or source, special nuclear or by-product material; and (e) special solid waste as defined in the Act. O.C.G.A. § 12–8–22(1.1), (12.1), (18), (33) and (37). Since biomedical waste is only one percent of the solid waste stream in Georgia, commercial biomedical waste is a very discrete, small segment of solid waste.

would be more effective in reducing spills or exposure to biomedical waste.

In sum, the burden imposed on interstate commerce by the "Georgia need" requirement is clearly excessive in relation to the putative local benefits. In fact, the State has not demonstrated that the "Georgia need" provision advances any legitimate purpose that could not be accomplished by other nondiscriminatory means. Thus, O.C.G.A. § 12–8–24(b)(1) violates the Commerce Clause and must be declared unconstitutional.

## C. THE "PLANNING REQUIREMENTS"

### 1. Planning Requirements Provision is Discriminatory

■ As outlined in the factual history above, O.C.G.A. § 12–8–24(g) (the "planning requirements provision") was also enacted as part of a comprehensive scheme by the State of Georgia to restrict the influx of waste from other states into Georgia and to restrict the movement of waste between counties in Georgia.[7] The out-of-state planning requirements provision, now included in O.C.G.A. § 12–8–24(g) (1993), was originally codified in O.C.G.A. § 12–8–27(f) (1992). As originally drafted, the planning requirements provision in O.C.G.A. § 12–8–27(f) required that an operator of a solid waste handling facility that accepted special solid waste (defined as out-of-state waste in Section 12–8–22(37) must provide certification that the jurisdiction generating the special solid waste (i.e., the out-of-state waste) has a strategy for and is actively involved in waste reduction goal and plan equivalent to Georgia's. In Southern States Landfill, Inc. v. Georgia Dep't of Natural Resources, 801 F.Supp. 725, 736 (M.D.Ga.1992), the federal district court held that Georgia's special solid waste statute, which included this planning requirement codified at O.C.G.A. § 12–8–27, was unconstitutional on its face because it applied to only out-of-state waste and thus violated the Commerce Clause (quoting 1991 Reheis Deposition, where the purpose of discriminating

against out-of-state waste was articulated by the Director).

In 1993, the Georgia General Assembly repealed O.C.G.A. § 12–8–27 and readopted a similar planning requirements provision into the current O.C.G.A. § 12–8–24(g) at issue in the case at bar. The planning requirements provision in O.C.G.A. § 12–8–24(g) now covers both in-state and out-of-state waste generating jurisdictions, but remains discriminatory in purpose and effect. The planning provision requires that before the Director may issue a permit to EWR for a solid waste handling facility, EWR must provide documentation that all out-of-state and in-state jurisdictions generating waste destined for EWR's facility have an approved waste reduction plan and are actively involved in and have a strategy for meeting planning requirements. O.C.G.A. § 12–8–24(g). However, Georgia's planning requirements provision is no less discriminatory because it applies to both in-state and out-of-state jurisdictions. See C & A Carbone, Inc. v. Town of Clarkstown, N.Y., —— U.S. ——, ——, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994) (An "ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition"); Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

In addition, the planning requirements in the current O.C.G.A. § 12–8–24(g), as construed by the Superior Court of Quitman County, limit a solid waste disposal permit to the acceptance of waste from in-state and out-of-state jurisdictions for which waste reduction planning verifications were submitted at the time of permit issuance. The planning requirements prohibit a permit applicant, who has a contract with a jurisdiction that is not part of an approved solid waste management plan or that does not have a plan in place which is substantially equivalent to that required by Georgia, from accepting waste from that jurisdiction. O.C.G.A. § 12–8–24(g). Plaintiff EWR's ability to accept waste from other cities and counties and from other states depends upon EWR's obtaining documentation from those other juris-

7. The "Georgia need" restriction is in O.C.G.A. § 12–8–24(a); the planning requirements provi- sion, in O.C.G.A. § 12–8–24(g); and the trans- portation limitation, in O.C.G.A. § 12–8–24(c).

dictions verifying that they have planning and waste reduction goals which meet (if in-state jurisdictions), or are substantially equivalent to (if out-of-state jurisdictions), Georgia's standards. O.C.G.A. § 12–8–24(g). If EWR cannot obtain such documentation for whatever reason, waste from those jurisdictions legally cannot be disposed of at EWR's facility. Thus, the effect of the statute as applied is to ban incoming out-of-state waste (at least for some states) from entering Georgia. As a result, the planning requirements impermissibly restrict disposal options based solely on the *geographic origin* of the waste and thus discriminate against out-of-state waste and waste generators. *See National Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management,* 910 F.2d 713, 717, 720–21 (11th Cir.1990) (statute prohibiting importation of hazardous waste from any state without either a hazardous waste disposal facility or a regional or interstate agreement for the disposal of its hazardous waste held a protectionist measure and violative of the Commerce Clause).

The market for biomedical waste disposal services is a regional one. As stated by the Supreme Court in *Carbone,* "the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." "[W]hat makes garbage a profitable business is not its own worth but the fact that its processor must pay to get rid of it." *Carbone,* —— U.S. at ——, 114 S.Ct. at 1682 (1994). In short, waste frequently crosses state and county boundaries in movement to transfer stations and disposal facilities. Requiring EWR to submit documentation from out-of-state waste jurisdictions that they have a waste reduction plan substantially equivalent to Georgia's clearly impacts and burdens interstate commerce. Likewise, requiring EWR to submit similar documentation from in-state jurisdictions also has economic effects interstate in reach. EWR's transfer station is a point at which waste from metro Atlanta, other areas in Georgia and from out-of-state is gathered, sorted and prepared for transportation to a disposal fa-cility. If EWR cannot submit the required documentation about planning in out-of-state jurisdictions, then EWR will have to segregate out-of-state from in-state waste and handle each differently, which burdens interstate commerce. Also, EWR will have to segregate Georgia waste from Georgia jurisdictions with documented waste management plans from Georgia waste from Georgia jurisdictions without such plans and then transport separately that latter waste to an out-of-state jurisdiction. Thus, requiring EWR, as an operator of a disposal facility, to submit documentation from both out-of-state and in-state jurisdictions about their waste plans burdens interstate commerce.[8]

The Supreme Court recently pointed out that while a law may regulate only waste generated in one municipality, the economic effects of the law may be interstate in reach. In *Carbone, Inc. v. Town of Clarkstown, N.Y.,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the municipal flow control ordinance regulated waste only within that town's jurisdiction. The town contended that the ordinance reached only waste in that jurisdiction and did not regulate interstate commerce. The United States Supreme Court disagreed and held that "[t]his reasoning is premised, however, on an outdated and mistaken concept of what constitutes interstate commerce. While the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach." —— U.S. at ——, 114 S.Ct. at 1681.

The planning requirements provision in O.C.G.A. § 12–8–24(g) discriminates based on geographic origin, burdens interstate commerce, and thus is subject to strict scrutiny under the Commerce Clause. *Fort Gratiot,* 504 U.S. at 359–61, 112 S.Ct. at 2024; *Diamond Waste, Inc. v. Monroe County, GA,* 796 F.Supp. 1511 (M.D.Ga.1992); *Mullis Tree Service, Inc. v. Bibb County,* 822 F.Supp. 738, 748 (M.D.Ga.1993) (Chief Judge Wilbur Owens declared county waste ordi-

---

8. Similarly, Scientific Waste Systems also has a transfer station in Atlanta that receives waste from Alabama, Tennessee and South Carolina where it is consolidated before being shipped to Tennessee or Florida for disposal. This further illustrates the interstate nature of the disposal of biomedical waste.

nance unconstitutional because it discriminated against out-of-county waste).[9] The planning requirements provision does not survive strict scrutiny because the State of Georgia has not shown that O.C.G.A. § 12–8–24(g) advances a legitimate local purpose that cannot be served adequately by reasonable nondiscriminatory alternatives. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality,* —— U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

The Director's stated purpose for the planning requirements provision in O.C.G.A. § 12–8–24(g) is "to assist EPD in planning to achieve the State goal for 25 percent reduction of solid waste by gathering information during the permitting process concerning the jurisdictions disposing of biomedical waste at various permitted facilities." Letter from Alan Gantzhorn, P–Ex 29. The Director states that the main goal of the planning requirements provision is to gather information. Letter, P–Ex 29. This stated purpose of gathering information bears no logical relationship to the statute and can be achieved by other nondiscriminatory means. For example, to the extent that the purpose of the statute is to gather information, this goal could be better achieved not by limiting interstate waste flow but by the State's either requiring the jurisdictions to file annual reports or by simply asking the permittee to submit the planning information on its various customers, whether in-state or out-of-state, where available. Also, if information-gathering is the true purpose of this provision, then it is redundant because there are already other information-gathering mechanisms available to the Director for the in-state generating jurisdictions. 1994 Reheis Deposition, P–Ex 30, 56–57. For example, the State of Georgia requires cities and counties to adopt municipal solid waste management plans and to submit annual reports about their solid waste management plans. O.C.G.A. §§ 12–8–31.1(a) and (d).[10]

In reality, the planning requirements provision appears to be an effort by Georgia to force other states to comply with planning and recycling goals which Georgia believes are appropriate. This is an attempt to extend Georgia's police powers beyond its jurisdictional boundaries. The Supreme Court has held that "[s]tates and localities may not attach restrictions to exports or imports in order to control commerce in other states." *See Carbone,* —— U.S. at ——, 114 S.Ct. at 1683 (citations omitted).

In-state jurisdictions have incentive under O.C.G.A. § 12–8–31.1(e) to approve solid waste plans because the Director can deny the issuance of any new permits to jurisdictions which fail to approve a plan by July 1, 1993. A State legitimately may exert its police power within the boundaries of the State. In contrast, the State of Georgia has no authority to require jurisdictions in other states to adopt such plans and waste reduction goals. *See Carbone* at ——, 114 S.Ct. at 1683. Thus, the requirement that planning verifications be submitted for out-of-state jurisdictions generating waste destined for a facility in-state imposes a greater burden on interstate commerce than on in-state commerce because the out-of-state jurisdictions would be subject to both Georgia's and its own State's requirements.

---

9. Another apparent purpose of the planning requirements is resource protectionism. Like the "Georgia need" provision, the planning requirements hoard Georgia's natural resources of air and of real property suitable for siting an incinerator by, in effect, restricting use of the EWR facility by generators, both in-state and out-of-state, located outside the county in which the facility is located. The United States Supreme Court has held such resource hoarding unconstitutional. *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1354; *Philadelphia v. New Jersey,* 437 U.S. at 627, 98 S.Ct. at 2537.

10. Although Georgia law requires each city and county to develop a municipal solid waste management plan by July 1, 1993, approximately 100 cities and counties, including the City of Atlanta and Fulton County, had not adopted approved municipal solid waste management plans as of July 5, 1994. The fact that Georgia has not been enforcing these requirements seemingly contradicts EPD's contention that the goal of the planning requirements imposed on EWR in the permitting process is to gather information about Georgia jurisdictions' waste management plans.

Georgia's treatment of hospitals, the main generators of biomedical waste, also shows that the purpose of the planning requirements was more to restrict the flow of out-of-state biomedical waste into Georgia than to gather information. Georgia allows hospitals to dispose of biomedical waste without the need for a permit, and thus, without the need to meet the planning requirements. Although hospitals usually have on-site incinerators, and thus, the incinerator is located in the jurisdiction generating the waste, the State does not require hospitals, as an incinerator operator, to submit information about its own solid waste management plan or its host jurisdiction's solid waste management plan. Yet EWR, as a proposed incinerator operator in Quitman County, Georgia, must submit that information about any out-of-state or in-state jurisdiction sending biomedical waste to EWR's facility.

Finally, if EWR cannot show that the out-of-state jurisdiction or in-state jurisdiction has adopted a suitable solid waste management plan, then this results in a ban of out-of-state or out-of-county waste coming into Quitman County, Georgia. Laws that, in effect, create bans on out-of-county or out-of-state waste repeatedly have been held unconstitutional. *See Diamond Waste, Inc. v. Monroe County, Ga.*, 796 F.Supp. 1511, 1519 (M.D.Ga.1992); *Diamond Waste, Inc. v. Monroe County, Ga.*, 731 F.Supp. 505 (M.D.Ga.1990), *aff'd in part and vacated in part, Diamond Waste, Inc. v. Monroe County, Ga.*, 939 F.2d 941 (11th Cir.1991) ("*Diamond I*").

In sum, Georgia's planning requirements are discriminatory in their purpose and effect, because they do not reasonably further, much less achieve, Georgia's stated goal of gathering information from other jurisdictions on their waste reduction planning. The State admits that it may readily obtain information on waste generating jurisdictions from a myriad of different sources and that the State has not pursued other nondiscriminatory alternatives to gather that information.

More importantly, EWR's proposed facility will handle only biomedical waste. While biomedical waste is included in Georgia's regulatory scheme for solid waste, biomedical waste is less than one percent of Georgia's solid waste stream. Biomedical waste is not readily recyclable or reusable, making reduction in generation difficult. Having the operator of a biomedical waste thermal disposal facility serve as an entity to gather information about in-state and out-of-state jurisdictions' solid waste plans is not reasonably related to the State's purported purpose for gathering information about a city or county's or another State's overall solid waste management plans. Also, should the State of Georgia truly seek information on the reduction of biomedical waste, then biomedical waste generators, e.g., hospitals, medical laboratories, would be the logical targets, not those entities involved with biomedical waste disposal. Thus, the planning requirements provision in O.C.G.A. § 12–8–24(g), at least as applied to permits for operators of biomedical waste thermal treatment disposal facilities, is discriminatory, impermissibly burdens interstate commerce, does not survive strict scrutiny, and thus violates the Commerce Clause.[11]

### 2. *Pike Balancing*

■ Even if O.C.G.A. § 12–8–24(g) regulates interstate and intrastate commerce evenhandedly and is not discriminatory on its face or in its purpose and effect, the burden imposed by the provision on interstate commerce is " 'clearly excessive in relation to the putative local benefits.' " *Pike*, 397 U.S. at 142, 90 S.Ct. at 847 (citations omitted); *Diamond Waste, Inc. v. Monroe County, Ga.*, 796 F.Supp. 1511, 1518 (M.D.Ga.1992).

As outlined above, the burdens imposed by the planning requirements upon the free movement of biomedical waste bear no relationship to and are excessive to any of the State's alleged benefits of gathering information or to any other possible local benefits. In his deposition in this case, the Director

---

11. The Court only reaches the narrow issues herein as to permits for biomedical waste thermal treatment disposal facilities. The Court does not reach whether planning requirements for sol-

id waste management could be drafted in a non-discriminatory manner without an impermissible burden on interstate commerce.

apparently contended that one of the purposes behind linking the issuance of permits to the development of local solid waste management plans was to encourage or compel local governments to adopt a local or regional solid waste management plan. Such reasoning has no relevance, however, to permits for a biomedical waste thermal treatment facility. The total amount of biomedical waste generated in Georgia is only a tiny fraction (less than one percent) of the total Georgia solid waste stream. Because of public health concerns, recycling goals are largely irrelevant as to biomedical waste. Because most biomedical waste is disposed of either at on-site privately-owned incinerators or at commercial facilities, local government officials are not likely to be motivated to adopt overall solid waste plans by the needs of the biomedical waste generators in their jurisdictions.[12] As a result, the burdens on the movement of waste are far greater than incidental and do not bear a reasonable relation to Georgia's stated purpose of encouraging local solid waste planning. *See Pike*, 397 U.S. at 142, 90 S.Ct. at 847. Also, as outlined above, Georgia already has other laws and regulations expressly requiring in-state juris-

dictions to adopt and file annual reports about their waste reduction plan and effects. O.C.G.A. §§ 12–8–31.1(a) and (d). Georgia's goals may be achieved by other nondiscriminatory means. In short, the planning requirements "materially affect" interstate commerce. Thus, as currently drafted, O.C.G.A. § 12–8–24(g) violates the Commerce Clause and is unconstitutional. *See Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 444, 80 S.Ct. 813, 816–17, 4 L.Ed.2d 852 (1960).[13]

### D. THE TRANSPORTATION RESTRICTION

#### 1. Transportation Restriction Statute is Discriminatory

As outlined in the factual history above, O.C.G.A. § 12–8–24(c) (the "transportation restriction") was also enacted as part of the same comprehensive scheme by the State of Georgia to restrict the influx of waste from other states into Georgia and to restrict the movement of waste between counties in Georgia.[14] The transportation restriction provides that EWR's "permit for the transportation of municipal solid waste

---

12. "The volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination of whether a State has discriminated against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992); *see also Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 363, n. 4, 112 S.Ct. 2019, 2025, n. 4. In this case, the State contends that imposing planning requirements upon waste generating jurisdictions will somehow coerce these jurisdictions to develop a waste disposal/reduction plan. However, given that biomedical waste composes such a small fraction (less than 1%) of Georgia's total waste, such a result seems unlikely.

13. In *Sporhase v. Nebraska*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), the Supreme Court permitted the State to grant a "limited preference" to its citizens for the use of groundwater. The Court has stated that its holding in *Sporhase* was premised on several different factors "tied to the single fact of life that 'water, unlike other natural resources, is essential for human survival.'" *Oregon Waste Systems*, —— U.S. at ——, 114 S.Ct. at 1354 (citing *Sporhase*, 458 U.S. at 952, 102 S.Ct. at 3462); *Sporhase*, 458 U.S. at 952–56, 102 S.Ct. at 3462–64.
The Supreme Court also has permitted discrimination against out-of-state economic inter-

ests and in favor of in-state interests in a narrow class of cases, where the State "has no other means to advance a legitimate local interest." *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). In *Maine v. Taylor*, the Supreme Court upheld the State's ban on importing baitfish because Maine had no other way to prevent the spread of parasites and the adulteration of its native species). *Id.* at 148–152, 106 S.Ct. at 2452–55. The State has never contended that the planning restrictions provision is the only means to reduce solid waste in Georgia. The State has not argued, and the Court does not find, that either *Sporhase v. Nebraska* or *Maine v. Taylor* governs the Court's analysis in this case.

14. The transportation restriction has its antecedents in a 1971 Georgia statute which prohibits the movement of waste across state or county boundaries unless permission is first obtained from the county in which the disposal facility is located. O.C.G.A. § 36–1–16 (1993). While still on the books, plaintiff EWR contends that this statute is patently unconstitutional in light of recent decisions. *See Diamond Waste, Inc. v. Monroe County, Ga.*, 731 F.Supp. 505 (M.D.Ga. 1990), *aff'd in part and vacated in part, Diamond Waste, Inc. v. Monroe County, Ga.*, 939 F.2d 941 (11th Cir.1991) ("*Diamond I*").

from a jurisdiction generating solid waste to a municipal solid waste disposal facility located in another county shall be conditioned upon the jurisdiction generating solid waste developing and being actively involved in, by July 1, 1992, a strategy for meeting the State-wide goal of waste reduction by July 1, 1996." O.C.G.A. § 12–8–24(d). Plaintiff EWR contends that the transportation restriction, O.C.G.A. § 12–8–24(c), is *per se* invalid because it discriminates against interstate commerce on its face and is supported only by protectionist motives. Since the transportation restriction clearly does not satisfy the *Pike* balancing test, it is unnecessary to decide whether the strict scrutiny test should also apply.

■ The biomedical waste transported by EWR to and from its transfer facility is in interstate commerce. EWR collects and transports waste from Alabama as well as from various Georgia counties. As outlined above, EWR's transfer station is a point at which waste from metro Atlanta, from other areas in Georgia, and from out-of-state is gathered, sorted, and prepared for transportation to a disposal facility at Georgia Baptist Hospital in Atlanta, Ogden Martin in Florida, or, once the EWR incinerator is built, Quitman County, Georgia, depending upon various factors such as volume and price. If a Georgia jurisdiction does not have a solid waste management plan, then EWR, in transporting the biomedical waste, must segregate that waste from jurisdictions that do have a solid waste management plan. Any statute that has the effect of requiring EWR to segregate and handle differently biomedical waste from out-of-state or from the City of Atlanta or another Georgia city, solely because of its geographic origin, places a burden on interstate commerce that is excessive to the local benefits.

O.C.G.A. § 12–8–24(c) also burdens interstate commerce because it bars the transporter from moving waste from one jurisdiction to a disposal facility in another county unless the former jurisdiction is involved in planning for solid waste reduction. As a result, unless a jurisdiction in Georgia develops a solid waste reduction plan, the transportation limitation blocks the export of waste to other Georgia counties. The result is that those generators located in jurisdictions without waste reduction plans must find a disposal facility within their respective jurisdictions or export their waste to out-of-state disposal facilities. The effect is an unconstitutional hoarding of local resources. *See Carbone,* —— U.S. at —— – ——, 114 S.Ct. at 1682–83.

■ O.C.G.A. § 12–8–24(c) is not saved merely because it regulates transportation of waste through only jurisdictions of the State. *See Fort Gratiot,* 504 U.S. at 361, 112 S.Ct. at 2024 ("a state may not avoid strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State rather than the State itself"). A legislative provision which limits the movement of waste between counties in Georgia based solely on its geographic origin has economic effects interstate in reach and thus discriminates against interstate commerce. *Id.; See Carbone,* —— U.S. at ——, 114 S.Ct. at 1681 ("while the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach"); *see also Diamond Waste, Inc. v. Monroe County, Ga.,* 828 F.Supp. 52, 53 (M.D.Ga.1993); *Mullis Tree Service,* 822 F.Supp. at 748; *Diamond Waste, Inc. v. Monroe County, Ga.,* 731 F.Supp. 505 (M.D.Ga.1990), *aff'd in part and vacated in part, Diamond Waste, Inc. v. Monroe County, Ga.,* 939 F.2d 941 (11th Cir.1991) ("*Diamond I*"). The Eleventh Circuit in *Diamond I* reviewed a county resolution evenly banning waste entering the county from both out-of-state and in-state jurisdictions. The Eleventh Circuit held that the resolution "is applied relatively 'even-handedly' and accomplishes a 'legitimate local purpose.'" 939 F.2d at 944. Nonetheless, the Eleventh Circuit held that the resolution violated the Commerce Clause because it impacted interstate commerce and because "Monroe County could have achieved its objectives 'as well with a lesser impact on interstate activities.'" 939 F.2d at 945.

Likewise, here the State of Georgia has not shown that O.C.G.A. § 12–8–24(c) advances a legitimate local purpose that cannot

be adequately served by reasonable nondiscriminatory alternatives.[15] *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 347–49, 112 S.Ct. 2009, 2017, 119 L.Ed.2d 121 (1992); *Carbone,* —— U.S. at ——, 114 S.Ct. at 1683. The Director's stated purpose for Section 12–8–24(c) is "to enable the Director of EPD to coerce local jurisdictions to engage in comprehensive solid waste planning." Letter from Alan Gantzhorn, P–Ex 29. In his deposition, the Director admitted that to his knowledge, EPD has not tried to enforce the transportation limitation and does not have access to the information necessary to enforce it. 1994 Reheis Deposition, P–Ex 30 at 39–40, 42–44, 47.

In addition, there are other nondiscriminatory, more effective means to achieve this stated purpose which are contained in other provisions of the Comprehensive Waste Management Act. For example, the State could simply enforce O.C.G.A. § 12–8–31.1 requiring each city and county in the State of Georgia to "develop or be included in a comprehensive solid waste management plan not later than July 1, 1993." O.C.G.A. § 12–8–31.1(a). However, as of July 5, 1994, approximately 100 cities and counties, including the City of Atlanta and Fulton County, had not adopted approved solid waste management plans. List of Eligible Governments, P–Ex 8. There was no evidence of any efforts by EPD to enforce compliance with the separate requirement that Georgia cities and counties adopt solid waste management plans. Enforcement of O.C.G.A. § 12–8–31.1 is a reasonable nondiscriminatory alternative to the discriminatory O.C.G.A. § 12–8–24(c).

The State contends that the transportation limitation on EWR's permit provides an incentive for all jurisdictions to adopt solid waste management plans and to reduce the amount of solid waste generated. Reducing waste and requiring solid waste management plans are undoubtedly legitimate legislative goals. However, as outlined above, biomedical waste is less than one percent of Georgia's solid waste stream and cannot be recycled or reused. It is highly unlikely that EWR, as an operator of a biomedical waste thermal treatment disposal facility, can coerce municipalities to adopt solid waste management plans or that denial of EWR's permit to operate a biomedical waste thermal treatment disposal facility in Quitman County, Georgia, will coerce other municipalities in Georgia to adopt solid waste management plans. Moreover, as outlined above, the State's purpose can be better achieved by other nondiscriminatory means.

EPD stresses that local municipalities responsible for waste management planning are also at times transporters of solid waste and that Section 12–8–24(c) allows EPD to revoke the transporters' permits and impose fines, which helps EPD bring direct pressure to bear on municipalities to complete solid waste planning. However, EPD admits that the Director could recall no enforcement action taken to date under this Section even though 100 cities and municipalities did not have approved solid waste plans as of July 5, 1994. Also, the plaintiff here is a private entity transporting only biomedical waste and seeking a permit to operate a biomedical waste thermal treatment disposal facility. Thus, at least as applied to the narrow set of circumstances in this case, Section 12–8–24(c) impermissibly burdens interstate commerce without any discernible benefit.[16]

In short, the evidence before the Court suggests that the true purpose behind not only the transportation limitation, but also the "Georgia need" and the planning requirements provision, is to keep out-of-state biomedical waste from coming into Georgia,

---

**15.** As discussed *supra,* Georgia permits hospital incinerators as a matter of rule and without any of the requirements at issue here. Hospitals are also permitted to incinerate biomedical waste without regard to where the waste was generated and without any requirement that the hospital show that it or its host jurisdiction has a solid waste management plan.

**16.** In this case, the Court reaches only the narrow issue of whether Section 12–8–24(c), as applied to plaintiff EWR as a transporter of biomedical waste, violates the Commerce Clause. The Court does not reach whether similar transportation limitations requiring documentation of a municipality's solid waste management plans, if imposed on those municipalities as transporters of solid waste, as opposed to private entities handling only biomedical waste, could be drafted in a nondiscriminatory manner without an impermissible burden on interstate commerce.

i.e., unconstitutional protectionism under the Commerce Clause. Under the *Pike* balancing test, the transportation limitation in O.C.G.A. § 12–8–24(c), at least as applied to EWR's permit to transport biomedical waste, has the effect of significantly restricting the movement of biomedical waste in interstate commerce, as well as significant economic effects interstate in reach, without any discernible local benefit. Therefore, the transportation restriction in O.C.G.A. § 12–8–24(c) is unconstitutional.

### E. *EWR SATISFIES STANDARDS FOR A PERMANENT INJUNCTION*

When the constitutionality of a statute is challenged, the following three criteria must be met before an injunction will be issued:

a. the fact of a constitutional violation must be established;

b. there must be a demonstration of continuing irreparable injury which will result if the injunction is not issued; and

c. there must be a demonstration of the lack of an adequate remedy at law.

*Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982) (citations omitted). As outlined above, the Georgia statutes in issue violate the Commerce Clause of the United States Constitution. Plaintiff EWR also has demonstrated irreparable injury. *Westin v. McDaniel,* 760 F.Supp. 1563, 1569 (M.D.Ga. 1991), *aff'd,* 949 F.2d 1163 (11th Cir.1991); *see also Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co. of N.Y., Inc.,* 749 F.2d 124, 126 (2d Cir.1984); *Tri–State Generation v. Shoshone River Power, Inc.,* 805 F.2d 351, 356 (10th Cir.1986). Unless the Court issues the requested injunction, plaintiff EWR will suffer severe, if not permanent, financial loss. *See Id.*

The State of Georgia has sovereign immunity and thus is not subject to a suit for damages. Thus, EWR has no adequate remedy at law for the violations of the Commerce Clause which prohibit EWR from constructing and operating its facility or which prevent EWR from freely soliciting and accepting business to transport and/or dispose of biomedical waste without restrictions based on the geographic origin of the waste.

Therefore, plaintiff EWR has satisfied the standards for issuing a permanent injunction.

### F. *ABSTENTION IS NOT PROPER*

The defendants contend that this Court should abstain from ruling on the issues involving the planning requirements provision contending that whether the Superior Court correctly applied the planning requirements is currently before the Georgia appellate courts. At trial, the State acknowledged that it was not requesting the Court to abstain on the issues involving the constitutionality of the Georgia need statute or the transportation limitations. Trial Transcript, Aug. 30, 1994, p. 146.

Under the *Pullman* abstention doctrine stated in *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a court may choose to abstain " 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law' ". *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (citations omitted). *Pullman* does not justify abstention in this case because the planning requirements provision in O.C.G.A. § 12–8–24(g) is unconstitutional and cannot be construed by any state court to be constitutional. *See Zwickler v. Koota,* 389 U.S. 241, 248–49, 88 S.Ct. 391, 395–96, 19 L.Ed.2d 444 (1967); *Bartholomew v. Port,* 309 F.Supp. 1340, 1342 (E.D.Wis. 1970).

Similarly, abstention under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), is not appropriate. While Georgia's Comprehensive Solid Waste Management Act is arguably part of a complex State regulatory scheme, the constitutional questions in this case are not "difficult questions of State law bearing on policy problems of substantial public impact whose importance transcends the result of the case ..." *Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989). Instead, the issues in the case at bar are easily resolved under the recent United States Supreme Court and

other federal court decisions striking down various state solid waste statutes which impermissibly interfere with interstate commerce. *See Hazardous Waste Treatment Council v. South Carolina,* 945 F.2d 781, 788 n. 10 (4th Cir.1991).

■ Where pending and possible future proceedings in Georgia courts will not fully resolve this controversy, the Court should not abstain. *See Cincinnati Ins. Co. v. Holbrook,* 867 F.2d 1330 (11th Cir.1989). All issues before this Court are not raised in the appeal pending before the Georgia Court of Appeals, and EWR may not have a later opportunity to raise some of these issues before any court if this Court does not rule on them at this time. *Lumen Const., Inc. v. Brant Const. Co., Inc.,* 780 F.2d 691, 695 (7th Cir.1985).

There is precedent in the Eleventh Circuit for hearing a case in this subject area. In a similar case also involving regulation in the field of solid waste management, neither the district court nor the Eleventh Circuit abstained from ruling on the constitutionality of the state statute even though a decision was rendered by the Superior Court of Georgia approximately three months before the district court ruled. *Diamond Waste, Inc. v. Monroe County, Ga.,* 939 F.2d 941 (11th Cir.1991); *Diamond Waste, Inc. v. Monroe County, Ga.,* 828 F.Supp. 52 (M.D.Ga.1993).

Based on the facts of this case, abstention is not proper for a variety of reasons, including but not limited to the following: (a) the fact that the state court case does not concern and will not dispose of all issues before this Court, (b) if this Court abstains, EWR loses the opportunity to challenge the statute at issue, and (c) the statute is unconstitutional and incapable of a construction by the state court which will make a ruling by this Court unnecessary.[17]

### G. *STATE LAW ISSUES*

A ruling on the supplemental issues of state law is made unnecessary by the above

rulings. Alternatively, the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise pendent jurisdiction over the State law claims made in Counts V, VI, VII, VIII, IX, X and XII.

### H. *COSTS AND ATTORNEYS FEES*

Commerce Clause violations are cognizable under 42 U.S.C. § 1983. *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). "Litigants who successfully bring suit under the Commerce Clause may recover damages under § 1983 and attorneys fees under § 1988." *BFI Medical Waste Sys. v. Whatcom County,* 983 F.2d 911, 913–14 (9th Cir.1993). The award of attorney's fees under Section 1988 to successful Section 1983 litigants is within the discretion of the district court. *BFI,* 983 F.2d at 914. In determining whether to award attorney's fees, the district court "must consider factors related to the Act's purpose," such as: "(1) the parties' reliance on the unavailability of a fee award; (2) the presence of bad faith by either party; (3) the size of the class benefitted by the litigation; (4) the need for an attorney's fee in order to attract competent counsel to the suit." *BFI,* 983 F.2d at 914.

In applying the above factors to the instant case, the Court finds, in its discretion, that the award of attorney's fees is not appropriate in the instant case. The parties' reliance on the availability or unavailability of a fee award has not been a factor in this case. There has been no bad faith on the part of either party. Further, the size of the class benefitted in this litigation is not large and plaintiff EWR has no need of the award of attorneys' fees in order to attract able and competent counsel. Therefore, for the reasons discussed above, the Court declines to award costs or attorney's fees in this case.

### I. *CONCLUSION*

Accordingly, judgment is hereby rendered in favor of the plaintiff EWR, as follows:

---

17. Even if the Georgia Court of Appeals reverses the Superior Court of Quitman County and adopts or reinstates the ALJ's decision that the planning requirements were satisfied because there was no waste currently destined for the facility, EWR will still be subject to the planning requirements once EWR's facility is built and EWR enters into contracts for waste destined for the facility and seeks modification of its permit.

1. The "Georgia need" provision in O.C.G.A. § 12–8–24(b)(1), which regulates only permits for biomedical waste thermal treatment facilities, is hereby DECLARED unconstitutional as violative of the Commerce Clause, and the Defendant is hereby PERMANENTLY ENJOINED from any further enforcement of O.C.G.A. § 12–8–24(b)(1) against EWR as an applicant for a solid waste handling permit for a biomedical waste thermal treatment facility.

2. The "planning requirements" set forth in O.C.G.A. §§ 12–8–24(g), 12–8–31.1(e)(3), and Ga.Comp.R. & Regs. r. 391–3–4–.02(10) apply to permits for all solid waste handling facilities, including but not limited to a biomedical waste thermal treatment facility. To the extent that the planning requirements (a) require EWR as an applicant for a solid waste handling permit for a biomedical waste thermal treatment facility, or a modification to such a permit, to provide verification that the in-state jurisdictions generating biomedical waste destined for the applicant's facility are part of an approved solid waste plan and are actively involved in and have a strategy for meeting Georgia's goal of 25 percent waste reduction by July 1, 1996, and (b) require EWR as an applicant for a solid waste handling permit for a biomedical waste thermal treatment facility to provide verification that the out-of-state jurisdictions generating solid waste destined for the applicant's facility are actively involved in and have a strategy for meeting planning requirements and a waste reduction goal equivalent to Georgia's, said planning requirements in O.C.G.A. §§ 12–8–24(g), 12–8–31.1(e)(3) and Ga.Comp.R. & Regs. r. 391–3–4–.02(10) are hereby DECLARED unconstitutional as violative of the Commerce Clause, and the defendant is hereby PERMANENTLY ENJOINED from any further enforcement of said planning requirements against EWR, as an applicant for a solid waste handling permit for a biomedical waste thermal treatment facility.

3. The "transportation restrictions" are set forth at O.C.G.A. § 12–8–24(c) and Ga. Comp.R. & Regs. r. 391–3–4–.06(3)(a)(8). To the extent that these transportation restrictions condition EWR's permit for the transportation of biomedical waste from a jurisdiction generating solid waste to a solid waste disposal facility located in this State unless the jurisdiction generating the waste is actively involved in and has a strategy for meeting the state-wide goal of solid waste reduction by July 1, 1996, said transportation restrictions in O.C.G.A. § 12–8–24(c) and Ga. Comp.R. & Regs. r. 391–3–4–.06(3)(a)(8) are hereby DECLARED unconstitutional as violative of the Commerce Clause, and the defendant is hereby PERMANENTLY ENJOINED from any further enforcement of said transportation restrictions against EWR as a transporter of biomedical waste to any solid waste disposal facility in this State and as a condition of EWR's permit for the transportation of solid waste.

4. The Defendant is hereby PERMANENTLY ENJOINED from imposing or enforcing Condition No. 14 or any condition on EWR's solid waste handling Permit No. 118–003P(Inc) which limits the capacity of the facility.

5. The Defendant is hereby PERMANENTLY ENJOINED from imposing or enforcing any condition on EWR's solid waste handling Permit No. 118–003P(Inc) which restricts the in-state or out-of-state jurisdictions from which EWR can accept waste for disposal.

6. The Court DENIES plaintiff's request for costs and attorney's fees.

IT IS HEREBY ORDERED.

### ORDER ON MOTION

After careful review of all parties' briefs, the Court **GRANTS** Plaintiff's Motion for New Trial [21–3] on the issue of Plaintiff's claim for attorneys' fees and hereby **VACATES** Sections II(H) and II(I)(6) of its Order dated October 28, 1994, which deny Plaintiff's claim for costs and attorneys' fees. All remaining portions of this Court's Order dated October 28, 1994 remain in full force and effect.

The Court schedules an evidentiary hearing on Wednesday, February 1, 1995 at 9:00 a.m. on Plaintiff's Motion to Alter or Amend Judgment [21–1] and [21–2] and Plaintiff's Motion for Attorneys' Fees [21–4]. At that

hearing, if any party wishes to submit additional evidence as to Plaintiff's claim for costs and attorneys' fees, the parties may submit evidence by way of affidavit or deposition. The Court is not suggesting whether additional evidence is or is not necessary, but simply affording all parties the opportunity to submit evidence on Plaintiff's claim for costs and attorneys' fees. At the hearing, the Court requests oral argument on the applicable legal standard and reasonableness of Plaintiff's request for costs and attorneys' fees.

The Court directs the parties to meet in person with their counsel at Defendant Director's offices for a settlement conference in an attempt to resolve the costs and attorneys' fees issue at least five days prior to the hearing. If the issue is not settled, the hearing will proceed.

IT IS HEREBY ORDERED.

### CONSENT ORDER

The matter of Plaintiff's Motion for an Award of Attorneys' Fees and Expenses, pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, Federal Rule of Civil Procedure 54(d) and the Local Rules of this Court, is presently pending before the Court. The Defendant in this matter, Harold Reheis, Director, Environmental Protection Division, Georgia Department of Natural Resources, has agreed to pay Plaintiff, Environmental Waste Reductions, Inc. ("EWR"), the sum of Forty Thousand Dollars ($40,000) for costs and attorneys' fees and expenses incurred by EWR in this litigation. The undersigned parties agree that payment of this sum by Defendant will resolve all outstanding issues in this case. Accordingly, the hearing on an award of costs and attorneys' fees and expenses to EWR, previously set for February 1, 1995, is hereby cancelled.

Judgment is hereby ENTERED in favor of the Plaintiff EWR and against the Defendant Harold Reheis in the amount of $40,000.

IT IS SO ORDERED AND ADJUDGED.